IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Shelly Kosen | ) | |
| 450 7th Street South | ) | |
| Hopkins, Minnesota 55434 | ) | |
| | ) | |
| Elizabeth Bradler | ) | |
| 121 Roosevelt Avenue | ) | |
| Dumont, New Jersey 07628 | ) | |
| | ) | |
| Lisa Granquist | ) | |
| 425 Frenn Avenue | ) | |
| Red Wing, Minnesota 55066 | ) | |
| | ) | |
| Deatra Harrington | ) | |
| 7612 35th Street, Apt. 1D | ) | Civil No. 1:02CV00082 (HHK) |
| Jackson Heights, New York 11372 | ) | CLASS ACTION |
| | ) | COLLECTIVE ACTION |
| Dawn Hausch-Cooper | ) | JURY TRIAL DEMAND |
| 5360 Rose Lane | ) | |
| Flint, Michigan 48506 | ) | |
| | ) | |
| Rebecca Hayes | ) | |
| 7 Locust Court | ) | |
| Hollidaysburg, Pennsylvania 16648 | ) | |
| | ) | |
| Jan Jackson | ) | |
| 144 Woodland Road | ) | |
| Tryon, North Carolina 28782 | ) | |
| | ) | |
| Catherine Kelly | ) | |
| 5227 Siesta Cove | ) | |
| Sarasota, Florida 34242 | ) | |
| | ) | |
| Eleni Kulinski | ) | |
| 13 Cheyenne Road | ) | |
| Lafayette, New Jersey 07848 | ) | |
| | ) | |
| Susan Marcotte | ) | |
| 7656 Hampshire Avenue North | ) | |
| Brooklyn Park, Minnesota 55428 | ) | |
| | ) | |
| | ) | |
| | ) | |

Lydia Murphy                                )
5071 Mahogany Ridge Road                    )
Naples, Florida 34119                       )
                                            )
Melissa Poole                               )
1620 Vivian Lane                            )
North Fort Meyers, Florida 33903            )
                                            )
Pauline Richards                            )
3544 Glenarden Road                         )
St. Paul, Minnesota 55112                   )
                                            )
Mary Elizabeth Griffin Roy                  )
20580 Carson Road                           )
Deephaven, Minnesota 55331                  )
                                            )
Susan Seltzer                               )
18 Woodland Road                            )
Edina, Minnesota 55424                      )
                                            )
Rosalie Villafrate                          )
19014 Cypress View Drive                    )
Fort Meyers, Florida 33912                  )
                                            )
Lois Wisocky                                )
8416 Quinn Avenue                           )
Bloomington, Minnesota 55437                )
                                            )
On behalf of themselves and all others similarly )
situated,                                   )
                                            )
            Plaintiffs,                     )
        v.                                  )
                                            )
                                            )
American Express Financial Advisors Inc., IDS )
Financial Services, Inc., IDS Life Insurance, Inc., )
American Express Financial Corporation and  )
American Express Company,                   )
                                            )
            Defendants.                     )

**<u>COMPLAINT</u>**

2

Plaintiffs, for their Complaint against defendants American Express Financial Advisors, Inc., IDS Financial Services, Inc., IDS Life Insurance Company, American Express Financial Corporation and American Express Company (collectively, "Amex"), allege and state, as follows:

## Introduction

1.     This case arises out of the Amex defendants' systemic discriminatory treatment of women who have applied for or attained the position of financial advisor in violation of federal and state civil rights laws.   Having satisfied all administrative prerequisites and negotiated successfully a comprehensive consent decree resolving class claims on a nationwide basis, Plaintiffs now file this Complaint.

## Parties

**A.     Plaintiffs & Class Representatives – Financial Advisors**

2     Elizabeth Bradler is a female resident and citizen of California.  She was employed by Amex as a financial advisor in its New Jersey Market Group from June 1996 through April 1999.

3.     Lisa Granquist is a female resident and citizen of Minnesota.  She was employed by Amex as a financial advisor in its Rochester, Minnesota office in the Northern Lakes Market Group from April 1999 until March 2000.

4.     Deatra Harrington is a resident and citizen of New York.  She was employed by Amex as a financial advisor in its New York Metropolitan Market Group from July 1997 through November 1999.

5.      Dawn Hausch-Cooper is a female resident and citizen of Michigan.  She has been employed by Amex as a financial advisor in its Greater Michigan Market Group since February 1996.

6.      Rebecca Hayes is a female resident and citizen of Pennsylvania.  She has been employed by Amex as a financial advisor in its Pittsburgh Market Group since January 1994.

7.      Jan Jackson is a 51 year old female resident and citizen of North Carolina. She was employed by Amex as a financial advisor in the Carolina and Eastern Georgia Market Group from February 1999 to March 2000.

8.      Shelly Kosen is a female resident and citizen of Minnesota.  She was employed by Amex as a financial advisor in the Twin Cities Market Group from July 1998 until May 1999.

9.      Eleni Kulinski is a female resident and citizen of New Jersey.  She was employed by Amex as a financial advisor in the New Jersey Market Group from March 1996 through January 1999.

10.      Susan Marcotte is a 54 year old female resident and citizen of Minnesota. She has been employed by Amex as a financial advisor in the New Brighton, Minnesota office since July 1997.

11.      Lydia Murphy is over the age of 40 and is a female resident and citizen of Florida.  She was employed by Amex as a financial advisor, advisor coach, assistant district manager, district manager and a manager coach in the West Florida Market Group from March 1997 until April 27, 2001.

4

12.     Pauline Richards is a 67 year old female resident and citizen of Minnesota. She was employed by Amex as a financial advisor in the Twin Cities Market Group from 1983 until 2000.

13.     Mary Elizabeth Griffin ("MEG") Roy is a 48 year old female resident and citizen of Minnesota.  She was employed by Amex as a financial advisor in the Twin Cities Market Group from December 1996 until January 2000.

14.     Susan Seltzer is a 51 year old female resident and citizen of Minnesota. She was employed by Amex as a financial advisor from October 1996 to August 1999 in the Twin Cities Market Group.  From August 1999 until April 2001, she was employed by Amex as a sales consultant in retail brokerage at its corporate headquarters.

15.     Rosalie Villafrate is a 56 year old female resident and citizen of Florida. She was employed by Amex as a financial advisor in the West Florida Market Group from June 1999 through March 2000.

16.     Lois Wisocky is a female resident and citizen of Minnesota.  She was employed by Amex as a financial advisor in the Twin Cities Market Group from August 1997 until June 1999.

**B.     Plaintiffs & Class Representatives – Financial Advisor Applicants**

17.     Catherine Kelly is a female resident and citizen of Florida.  She has worked for Amex in various capacities in the Detroit, Michigan and West Florida Market Group since August 1990.  Following a layoff in February 2001, Amex failed and refused to rehire Ms. Kelly as a financial advisor employee.

18.     Melissa Poole is a female resident and citizen of Florida.  She was employed by Amex as an administrative support person and assistant to the associate vice

president in the West Florida Market Group from September 15, 1999 until April 6, 2001.

During this time she sought to become a financial advisor, but was rejected by Amex.

      **C.**      **Defendants (Collectively, "Amex")**

19.      American Express Financial Advisors Inc. ("Amex Advisors") is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. It is a wholly owned subsidiary of and the principal marketing arm of American Express Financial Corporation. Amex Advisors maintains a field force of over 12,000 financial advisors and has offices throughout the United States including the Washington, D.C. Metropolitan area. Amex Advisors was previously known as IDS Financial Services, Inc. ("IDS"). To the extent IDS and its subsidiary, IDS Life Insurance Company ("IDS Life"), still exist, they are Delaware corporations and are wholly-owned subsidiaries of American Express Financial Corporation.

20.      American Express Financial Corporation ("Amex Financial") is a Delaware corporation with its principal place of business in Minneapolis, Minnesota. Amex Financial provides a variety of financial products and services to help individuals, businesses and institutions to establish and achieve their financial goals. Amex Financial's products and services include financial planning and advice, insurance and annuities, a variety of investment products (including investment certificates, mutual funds and limited partnerships), investment advisory services, trust and employee plan administration services, personal automobile and homeowner's insurance, and retail securities brokerage services.

21.      American Express Company ("AXP") is a Delaware corporation with its principal place of business in New York, New York. AXP is the direct or indirect parent

corporation of Amex Advisors, Amex Financial, IDS and IDS Life.  AXP offers financial

services, credit services and travel-related services to individuals and other legal entities.

## Jurisdiction and Venue

22.     This court has subject matter jurisdiction over this action pursuant to 28

U.S.C. §§ 1331, 1343 and 1367 because this action is brought under the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, the Equal Pay

Act ("EPA"), 29 U.S.C. § 206(d) *et seq.*, Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. § 2000e *et seq.* and applicable state and local laws prohibiting age,

gender and pay discrimination in employment.

23.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)

because the Amex defendants reside or may be found in the District of Columbia.

## Exhaustion of Administrative Remedies

24.     Plaintiffs have each filed timely charges of discrimination with the Equal

Employment Opportunity Commission and applicable state and/or local agencies

alleging, among other things, class-wide gender, gender "plus" age and equal pay

discrimination against Amex with respect to the hiring, compensation, and promotion of

financial advisors in violation of Title VII, the ADEA, the EPA and applicable state

and/or local civil rights laws.

25.     Plaintiffs have each received notices of right to sue from the EEOC and

other administrative agencies and, accordingly, have exhausted all administrative

prerequisites for the maintenance of this action.

**Facts**

A.     **The Commencement and Nature of the Relationship Between Amex and Its Financial Advisors**

26.     Amex provides financial services to its clients through three separate and interrelated distribution channels: retail (financial advisors, telephone and internet), institutional and third party.  Of these, the principal channel is Amex's core of financial advisors "in the field" who offer financial planning and investment advice to businesses and individuals.  Such advice covers a wide variety of planning and investment products, nearly all of which are distributed by Amex Financial and its affiliates and subsidiaries, including IDS and IDS Life.

27.     In order to obtain an "appointment" as an Amex financial advisor, an individual must complete an eight to twelve week training period.  During this pre-appointment period, the prospective financial advisor must attend training sessions and obtain his or her licenses.  Upon successful completion of the training period and passing a financial planning examination, the prospective advisor is hired by Amex as an "employee" for a one-year period, provided further training, and given a certain number of accounts and client leads in order to get his or her practice off the ground.  Most of an advisor's compensation during this one-year period is in the form of a fixed salary.

28.     Prior to March 2000, the relationship between Amex and its financial advisors was governed by an agreement entitled "Personal Financial Advisor's Agreement."  Under that agreement, the nominal status of all Amex financial advisors was altered from "employee" to "independent contractor" following the completion of the initial one-year period.  In March 2000, Amex established a new system under which some

advisors have been permitted to "select" whether they wish to be categorized as employees (called "Platform 1," or "P1" positions) or independent contractors (called "Platform 2," or "P2"positions).   Under the new "platform" system, the only way financial advisors can be promoted into management is if they are in a P1 position.

29.     Despite the provision in its standard-form contract characterizing financial advisors as "independent contractors," Amex has – both before and after its adoption of the "platform" system in March 2000 – retained the right to control the manner and means through which all of its advisors provide planning and investment services to the general public.  Amex has exercised that control over numerous aspects of an advisor's work including, but not limited to, communications (both written and oral) to clients and potential clients (including the substance and frequency of such communications and the circumstances under which they can be made), production quotas, dress codes, reporting, record-keeping and maintenance, advertising, business card and letterhead, office location and layout, performance appraisal and training.  Moreover, financial advisors are only permitted to market such products and services as are authorized by Amex and are prohibited from selling any products or services that compete with those offered by Amex Advisors, Amex Financial or other Amex affiliates.

**B.     The Patterns or Practices of Discrimination Experienced by Plaintiffs and Class Members**

30.     Since at least December 8, 1998, Amex has adopted and maintained a systematic practice of denying equal employment opportunities to women, including women forty years of age and above.  Amex has engaged in a pattern and practice of gender and gender "plus" age discrimination with respect to hiring females for the

position of financial advisor and promoting females from the position of financial advisor to other more prestigious, higher paying roles or positions.  Amex also has engaged in a pattern and practice of gender, gender "plus" age and equal pay discrimination with respect to compensation and other terms and conditions of employment of female financial advisors that affect compensation and promotion opportunities, including, but not limited to, less favorable assignment of lucrative accounts and valuable leads and less favorable mentoring and training opportunities compared to their male counterparts.

31.     The above-described discriminatory practices are the product of a stereotype – pervasive both inside Amex and throughout the industry – that women do not have what it takes to succeed in the financial planning business and that only young males have the temperament and ability to achieve aggressive sales.  The existence of this stereotype is well known to Amex's senior management and to its human resources department, which is responsible for addressing human resources issues, including compliance with federal and state civil rights laws, on a centralized and company-wide basis.  Despite such awareness, neither senior management nor the human resources department has taken sufficient steps to discourage the discriminatory practices described herein.  Indeed, far from responding to the numerous complaints that have been brought to its attention by female financial advisors, the human resources department frequently has participated in and encouraged such practices.

32.     From the moment female applicants first express interest in the position of financial advisor, they are denied equal opportunity to be hired.  For example, Plaintiff Poole was denied equal access to the Amex preparation courses for the Series 7 exam and

when, as a result, she failed the exam the first time, Amex denied her a "second window" to take the exam as was routinely provided to similarly situated males.

33.    Those women who manage to get hired as financial advisors are denied equal opportunities for career advancement.  During the initial training period, for example, Amex provides support for its male trainees – including support in obtaining the licenses necessary for practice in the field – that is not made available to their female counterparts

34.    Upon obtaining their appointments, female financial advisors suffer discrimination in virtually every aspect of their employment relationship with Amex.  At the outset, in each entering class, Amex's all-male management team hand-picks certain advisors – almost all of whom are male – to be "superstars."  These "superstars" are taken under the wing of managers, who provide them with mentoring and business that virtually ensures their financial success and subsequent promotion.  The exclusion of female advisors from the "superstar" ranks of Amex is the product of blatant sexism.  For instance, following her appointment as a financial advisor, one manager informed Plaintiff Kulinski that: "you will not make it in this business because you are a woman. Women would rather stay home and have a man take care of them.  The only people who succeed in this business are white males."  Accepting this stereotype, Amex's management has, in fact, made it impossible for women to succeed as financial planners by denying them training, leads, accounts and promotions and in otherwise denying them opportunities for career advancement that are readily available to male advisors.

35.    The process of training and mentoring financial advisors is an ongoing one that continues long after their initial appointment.  As is the case during the training and

probationary period, however, Amex's training and mentoring efforts focus almost exclusively upon its male advisors, who are provided with one-on-one consultations and other specialized training that is not generally available to their female counterparts. Similarly, while male managers frequently attend client meetings with male advisors and assist them in making presentations, conducting seminars and closing deals, when female advisors have requested similar assistance, those requests are typically refused. Indeed, when Plaintiffs Marcotte and Kulinski made such requests, they were belittled by their managers and, in Plaintiff Marcotte's, case told to "shut the fuck up" and to "handle [her] own appointment." Likewise, Plaintiff Bradler's manager declined her request for "one-on-one consultation" because she was "just too beautiful" and he was "afraid" that he "might say something wrong."

36.     The ability of a financial advisor to build a successful portfolio of business depends largely upon the volume and quality of "leads" that are either purchased from or given by Amex. The better the leads that are assigned to a financial advisor, the greater the income and the more rapid the career advancement. As a general matter, however, the leads that Amex provides to its male advisors are both substantially more plentiful and more valuable than the leads it provides to its female advisors. For instance, male advisors are generally sold, or given free-of-charge, lucrative leads from higher income areas. Female advisors, on the other hand, are often charged hundreds, if not thousands, of dollars for worthless leads, originating in low-income neighborhoods or involving clients who have been previously contacted without success. In many cases in which female advisors have brought in their own high quality leads, management has transferred those leads to male

advisors.  The disparity between male and female advisors in the assignment of leads is reflected in the experience of the Plaintiffs.  For instance:

- While the three male advisors who were in her entering class were each given 100 new, uncalled leads, Plaintiff Kulinski was furnished with just 21 leads, all of which had been previously contacted without success;

- Plaintiff Granquist was denied the opportunity to purchase leads altogether;

- At the same time that she was informed by one of her male counterparts that his leads were improving, Plaintiff Jackson was informed by Amex that it was running out of leads and, hence, was unable to provide her any; and,

- Plaintiff Hayes paid approximately $10,000 for leads, which she later learned had been previously given to young male advisors who had been unable to obtain any business from them.

37.    Like the assignment of leads, the assignment of accounts to a financial advisor plays a vital role in his or her ability to succeed in the financial planning business. Yet, the same pattern of discrimination that characterizes the distribution of leads between male and female advisors also characterizes the distribution of accounts.  Thus, while existing accounts are typically assigned to male advisors in order to enable them to get their practices off the ground, far fewer such accounts are distributed to female advisors and, those that are distributed to them are generally much less lucrative.  This pattern of discrimination is reflected in the experiences of the Plaintiffs.  For instance:

- The district manager for Plaintiff Bradler, upon advising her that her refusal to invite him into her apartment could result in her not obtaining accounts, assigned her just ten accounts, while assigning approximately 200 accounts to a male advisor;

- Plaintiff Granquist was given no accounts, while a new male advisor was handed 100 existing accounts soon after he started;

- Plaintiff Marcotte received only a handful of accounts worth between $1,000 and $2,000, while her male counterparts were assigned accounts worth $30,000 to $500,000; and,

- Plaintiff Seltzer was given 40% fewer accounts than a young male advisor who started the same day as she did.

38.     In addition to distributing accounts to financial advisors upon their appointment, Amex also distributes accounts to advisors on an *ad hoc* basis when other advisors leave the company or are promoted.  Despite the existence of guidelines and criteria governing the distribution of such accounts, they are disproportionately assigned to male advisors.  Moreover, at the same time that Amex has systematically denied its female advisors equal access to available accounts, it has frequently forced female advisors to transfer their own accounts to male advisors in order to help those male advisors meet their quotas.  Again, the experiences of the Plaintiffs are typical of this pattern or practice of discriminatory behavior.  For instance:

- Plaintiff Harrington was forced to obtain all of her accounts through her own efforts, while two of her male colleagues were handed some 700 accounts to split between them;

- Though Plaintiff Cooper met the criteria for receiving certain transferred accounts, they were given to a male advisor who did not meet those criteria; and,

- Despite the fact that Plaintiff Seltzer also met the criteria for obtaining them, numerous valuable accounts were instead transferred to male advisors who did not meet the criteria and had brought in only a handful of their own accounts.

39.     Rather than instituting any kind of formal or even informal process for applying for promotions, until March 2000 Amex traditionally approached advisors whom it considered to be worthy and extended them offers.  In view of the widespread perception among all levels of management that women do not have the qualities necessary to succeed in the business, it is not surprising that those who were approached with such offers were

almost exclusively male.  As one Amex manager acknowledged, it is "very difficult" for women to enter the ranks of the "all male" management team.

40.     At about the time that it adopted the "platform" system in March 2000, Amex began to post the availability of supervisory positions and instituted procedures through which financial advisors could submit applications for those positions.  Despite the initiation of such procedures, Amex has continued its prior practice of affirmatively approaching male advisors about opportunities for promotion and advancement.  At the same time, Amex has discouraged female advisors from obtaining P1 status – a status that has become a prerequisite for promotion – or otherwise from pursuing management positions.  For instance, female advisors, including many of the Plaintiffs, who have expressed interest in obtaining promotions have been told that Amex "does not like women in management," that managerial track positions are "not for soccer moms," that they should just wait for their "husbands to make more money," that they should consider what would be "right for their family," that the hours are too long and that they could never pass the tests or meet other criteria that are required for promotion to management.

41.     In those cases in which female advisors have not been deterred from applying for promotions, their applications have been routinely rejected.  For example, several of the Plaintiffs (including Plaintiffs Bradler, Cooper, Hayes, Roy and Wisocky) have sought managerial positions, but, despite the fact that they met or exceeded the stated criteria for those positions, were passed over in favor of male advisors who were less qualified and often did not meet that criteria.

42.     Owing principally to their inability to obtain equal access to training, mentoring, leads, accounts and other forms of support, female advisors have much greater

difficulty meeting their production quotas than do their male counterparts and, consequently, are terminated or constructively discharged at disproportionately higher rates. Indeed, several of the Plaintiffs, including Plaintiffs Harrington, Jackson, Kosen, Kulinsky, Villafrate and Wisocky, were discharged for precisely this reason.

43.     Complaints about Amex's discriminatory practices trigger swift and certain retaliation.  Indeed, when Plaintiff Cooper complained of discriminatory treatment to her ombudsperson, he admitted the existence of such a policy, warning her that bringing the complaint to the attention of the human resources department would end her career with Amex.  It should, therefore, hardly be surprising that each of the eight Plaintiffs who complained to human resources about having suffered gender discrimination (Plaintiffs Bradler, Cooper, Kosen, Kulinski, Roy, Seltzer, Villafrate and Wisocky) was terminated or constructively discharged shortly after having done so.  For example, in approximately October 1998, Plaintiff Bradler complained to human resources that she was being subjected to severe harassment and discrimination.  After months of inaction, she was informed that there was nothing that could be done because her manager had denied her allegations and, within a few weeks, that same manager helped orchestrate a pretext for her dismissal from the company.

44.     Similarly, Plaintiff Seltzer was retaliated against for filing EEOC charges alleging a nationwide pattern of sex discrimination at Amex.  Following a discussion with her manager in which she complained about having been retaliated against for the filing of those charges, Ms. Seltzer was given a written "warning" threatening her termination. She was subsequently interrogated by the human resources department concerning why she would want to stay with the company after having filed EEOC discrimination

charges.  Finally, in April 2001, Ms. Seltzer was terminated after being accused by a human resources representative of staying with the company in order "to trap us."

45.    Embracing the stereotypical notion that only young men have what it takes to succeed in the business, Amex has tolerated and condoned a corporate culture and work environment that is hostile to women.  Illustrative of this environment is the establishment and sponsorship by Amex of corporate functions and activities that are male-oriented and demeaning to women.  For instance, when advisors and managers congregate for training at Amex's centralized facility in Chaska, Minnesota, they are routinely encouraged to visit a nearby Hooter's restaurant so that they can see the "incredible" scantily-clad female wait staff.  Likewise, other social activities that are sponsored or otherwise encouraged by Amex – such as "splat ball," golf outings and visits to local strip bars – are intended to promote camaraderie and bonding between male advisors and male managers to the exclusion of Amex's female work force.

46.    The sexist attitudes that characterize the corporate culture at Amex have given rise to a day-to-day work environment that is extremely abusive and, for many women, intolerable.  Many female advisors have received unwelcome sexual advances from their managers, including, for example, Plaintiff Bradler whose manager invited himself into her apartment and, when she subsequently sought a transfer to get away from him, told her that he could not let her go because he would "miss having [her] beautiful body around."   It is also commonplace at Amex field offices throughout the country for female advisors to be verbally abused, yelled at, sworn at, belittled and otherwise insulted.  Many women have been subjected to overtly sexist comments, including Plaintiffs Granquist and Kulinski, who have been expressly told that female advisors

"cannot make it" in the business and that there is "no place for them" at the company. Similarly, Plaintiff Villafrate's manager has frequently made derogatory remarks about older women and, on one occasion, advised a group of financial advisors to overlook women in Italian families because "old Italian mammas don't know how to write a check."

47.     In short, Amex has adopted and maintained a systematic policy or practice of gender and gender "plus" age discrimination that has denied women including women age forty and over, equal employment opportunities in blatant disregard of federal, state and local civil rights laws.  These discriminatory policies or practices include, but are not limited to, the following:

a.     failing and refusing to hire female applicants for financial advisor positions, including denying them the same opportunities to qualify for advisor positions as provided to similarly situated men.

b.     failing and refusing to promote female trainees to financial advisor positions;

c.     assigning female advisors fewer accounts, and accounts of lesser value and production potential, than are assigned to male advisors;

d.     denying female advisors the type of job assignments (such as participation in marketing activities), which can lead to lucrative accounts and clients;

e.     denying female advisors client leads or providing them with leads that have far less potential than the leads provided to male advisors;

f.     assigning fewer and much less valuable accounts to female advisors than are assigned to male advisors, even where the client holding the account specifically requests a female advisor;

g.     denying female advisors promotional opportunities to management positions;

h.      maintaining a segregated work environment in which female advisors are kept in low-paying, slow-track positions through arbitrary and subjective practices;

i.      paying female advisors compensation that is far lower than that paid to similarly situated male advisors, failing to pay them compensation that they have earned, and denying them opportunities to increase their earnings;

j.      channeling female advisors into depressed markets with far less potential than the markets to which male advisors are assigned;

k.      denying female advisors training and mentoring, including denial of specialized training  (such as one-on-one meetings with district managers and "go-to" managers) given to male advisors; and,

l.      denying female advisors other benefits and conditions of employment on the same terms applied to male advisors.

**C.      The Effect Of Amex's Discriminatory Practices On Its Female Advisors**

48.      The cumulative effect of Amex Advisor's discriminatory practices upon female financial advisors has been devastating.  Throughout the course of their careers at Amex, female advisors have been left behind, while their less qualified male advisors have enjoyed promotions and great financial rewards.  Indeed, owing to nothing other than their gender, most female advisors will, during the course of their careers, receive tens or even hundreds of thousands of dollars less in compensation than their male counterparts.  As Amex requires its advisors to pay for overhead and leads, this disparity in compensation can lead to economic ruin.  For instance, Plaintiff Kulinski – a single mother of two – almost had her heat turned off and nearly lost her home because she was forced to pay more money to Amex for useless leads than she was able to make providing planning and investment advice.

49.     Apart from the economic hardship that they have been forced to endure, female advisors have suffered severe emotional distress as a result of their exposure to constant discrimination.  Many of these women have been forced to seek psychiatric help, including medication for anxiety and depression.  These otherwise intelligent, capable and stable women have had their confidence and self-esteem shattered because of the demeaning attitudes and conduct of their employer.

50.     Female advisors cannot escape the consequences of Amex's discriminatory practices simply by leaving the company.  Amex is required to report the reason for the departure of every financial advisor to the National Association of Securities Dealers on a form that is called the "U-5."  When a woman is terminated or constructively discharged from the company, Amex will generally report a negative reason for such termination or discharge, such as the failure to meet production quotas.  As an advisor's U-5 follows them wherever they go, such a negative notation makes it virtually impossible for a departing financial advisor to find new employment in the industry or to build her own practice.  Accordingly, the careers of those financial advisors who are terminated by Amex are effectively ruined by sex discrimination.

**Class Action Allegations**

51.     Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), Plaintiffs Elizabeth Bradler, Lisa Granquist, Deatra Harrington, Dawn Hausch-Cooper, Rebecca Hayes, Jan Jackson, Shelly Kosen, Eleni Kulinski, Susan Marcotte, Lydia Murphy, Pauline Richards, Mary Elizabeth Griffin Roy, Susan Selzer, Rosalie Villafrate and Lois Wisocky seek to represent a nation-wide class (the "Damages and Injunctive Class") consisting of:

All women affiliated with American Express Financial Advisors Inc. as financial advisors at any time between December 8, 1998 and the present.

52.    *Numerosity.*  The number of women in the class exceeds 4,000.  It would be impracticable to bring all, or even a substantial percentage of, such persons before the Court as individual plaintiffs through joinder.

53.    *Commonality.*  There are questions of law and fact common to the class. The overarching question of law and fact that is common to all members of the class is: whether Amex, through the acts and/or omissions of their management and supervisory workforce, have adopted and/or maintained a policy or practice of employment discrimination that is generally applicable to the class of all of Amex's female financial advisor incumbents.  This overarching common issue of law and fact includes numerous subissues of law and fact that are also common to all members of the class.  These subissues include, but are not limited to, the following:

- Whether the relationship between Amex and the financial advisors that it has hired is that of employer-employee for purposes of Title VII;

- Whether Amex's female financial advisors have been promoted at rates that are disproportionately low compared to the rates at which male financial advisors have been promoted;

- Whether Amex's female financial advisors have been afforded treatment in respect of numerous aspects of employment (including training, compensation and lead and account distribution) that is less favorable than the treatment afforded by Amex to its male financial advisors;

- Whether the reason that Amex has afforded its female financial advisors less favorable treatment than its male financial advisors is the acceptance of an invidious stereotype;

- Whether the employment policies or practices of Amex that have adversely affected its female advisors violate Title VII under either a disparate treatment or a disparate impact theory; and

- Whether Amex's discriminatory employment practices are sufficiently egregious to justify the imposition of punitive damages under Title VII.

54. *Typicality.* The claims of each of the above-identified class representatives are typical of the claims of all class members: (a) because they have all been subjected to the same company-wide practice of gender discrimination in employment; (b) because all of their claims are based upon allegations that they have been adversely affected by that practice of gender discrimination in a similar manner in that they have received less favorable treatment than their male counterparts with respect to numerous aspects of employment; and, (c) because their claims are all based on the same legal theory or theories.

55. *Adequacy of Representation.* All of the above-identified class representatives are adequate representatives of the class because: (1) they are willing and able to represent the proposed class and have every incentive to pursue this action to a successful conclusion; (2) their interests are not in any way antagonistic to those of the other class members; and (3) they are represented by counsel experienced in litigating major class actions in the field of employment discrimination.

56. *Propriety of Maintenance of Class Action Under Fed. R. Civ. P. 23(b)(2).* Class action status is appropriate under Fed. R. Civ. P. 23(b)(2) because Amex has acted and/or refused to act on grounds generally applicable to the class, thereby making declaratory and final injunctive relief appropriate. Such generally applicable grounds consist of the adoption and/or maintenance by Amex of a common, company-wide policy or practice of gender discrimination in employment to which each member of the class has been subjected.

57.    *Propriety Of Maintenance of Class Action Under Fed. Civ. P. 23(b)(3).*

Class action status is also appropriate under Fed. R. Civ. P. 23(b)(3).  The common questions of law and fact identified in Paragraph 53 above predominate over questions affecting only individual members.  A class action – particularly where, as here, the parties have stipulated to certification and negotiated a class-wide resolution -- is superior to other available methods for the fair and efficient adjudication of this litigation. Inasmuch as all members of the class are geographically dispersed throughout the country and allege that they were subjected to the same company-wide policy or practice of gender discrimination, requiring each class member to pursue her claim individually would entail needless duplication and would waste the resources of both the parties and the federal judiciary.  The financial burden of proving Amex engaged in such a pattern or practice of discrimination would also make the prosecution of individual actions virtually impossible for most, if not all, members of the class.

58.    Pursuant to Fed. R. Civ. P. 23(b)(2), Plaintiffs Catherine Kelly and Melissa Poole seek to represent a separate nation-wide class (the "Injunctive Class") consisting of:

> All women who applied to and were rejected by American Express Financial Advisors Inc. for positions as financial advisors at any time between December 8, 1998 and the present.

59.    *Numerosity.*  The number of women in the class is estimated to exceed 1,000.  It would be impracticable to bring all, or even a substantial percentage of, such persons before the Court as individual plaintiffs through joinder.

60.    *Commonality.*  There are questions of law and fact common to the class. The overarching question of law and fact that is common to all members of the class is:

whether Amex, through the acts and/or omissions of their management and supervisory workforce, have adopted and/or maintained a policy or practice of employment discrimination that is generally applicable to the class of all of Amex's female financial advisor applicants. This overarching common issue of law and fact includes numerous subissues of law and fact that are also common to all members of the class. These subissues include, but are not limited to, the following:

- Whether the potential relationship between Amex and the financial adviser applicants is that of employer-employee for purposes of Title VII;

- Whether female applicants for the position of financial advisor have been hired at rates that are disproportionately low compared to the rates at which male financial advisors applicants have been hired;

- Whether Amex's female financial advisor applicants have been afforded treatment that is less favorable than the treatment afforded by Amex to its male financial advisor applicants;

- Whether the reason that Amex has afforded its female financial advisor applicants less favorable treatment than its male financial advisor applicants is the acceptance of an invidious stereotype;

- Whether the employment policies or practices of Amex that have adversely affected its female advisor applicants violate Title VII under either a disparate treatment or a disparate impact theory; and

61. *Typicality.* The claims of each of the above-identified class representatives are typical of the claims of all class members: (a) because they have all been subjected to the same company-wide practice of gender discrimination in hiring; (b) because all of their claims are based upon allegations that they have been adversely affected by that practice of gender discrimination in a similar manner in that they have received less favorable treatment than their male counterparts; and, (c) because their claims are all based on the same legal theory or theories.

24

62.     *Adequacy of Representation.*     All of the above-identified class representatives are adequate representatives of the class because: (1) they are willing and able to represent the proposed class and have every incentive to pursue this action to a successful conclusion; (2) their interests are not in any way antagonistic to those of the other class members; and (3) they are represented by counsel experienced in litigating major class actions in the field of employment discrimination.

63.     *Propriety of Maintenance of Class Action Under Fed. R. Civ. P. 23(b)(2).* Class action status is appropriate under Fed. R. Civ. P. 23(b)(2) because Amex has acted and/or refused to act on grounds generally applicable to the class, thereby making declaratory and final injunctive relief appropriate.   Such generally applicable grounds consist of the adoption and/or maintenance by Amex of a common, company-wide policy or practice of gender discrimination in hiring to which each member of the class has been subjected.

### Collective Action Allegations

64.     Pursuant to 29 U.S.C. § 216(b), Plaintiffs seek to prosecute their Equal Pay Act claim as a collective action on behalf of all similarly situated class members who give their written consent to participate.

65.     Pursuant to 29 U.S.C. § 216(b), Plaintiffs who are 40 years of age and above seek to prosecute the age component of their "gender" plus age claim under the Age Discrimination in Employment Act as a collective action on behalf of all similarly situated class members who are 40 years of age and above and give their written consent to participate.

## COUNT I

## EMPLOYMENT DISCRIMINATION ON THE BASIS OF GENDER -- CLASS CLAIMS FOR RELIEF

66.     Plaintiffs restate and reallege the allegations contained in Paragraphs 1 through 65 of this Complaint as though set forth here in full.

67.     Plaintiffs and members of the classes are applicants for employment or employees of Amex within the meaning of 42 U.S.C. § 2000(e) *et seq*.

68.     The discriminatory policies or practices of Amex, as set forth in this Count, deny Plaintiffs and members of the classes their right to equal employment opportunity in violation of 42 U.S.C. § 2000(e) *et seq*.

69.     Amex has adopted and/or maintained a system-wide policy or practice of gender discrimination by, among other things, denying Plaintiffs and members of the classes equal opportunities as described in Paragraphs 30 through 47, above.

70.     Amex's discriminatory and unlawful employment practices have been intentional, deliberate, willful and oppressive, and have been conducted in reckless and callous disregard for the rights of Plaintiffs and members of the Damages and Injunctive Class.

71.     Amex has adopted and/or maintained subjective employment practices, including but not limited to, subjective practices for assessing and evaluating the ability and potential of their financial advisors that have had the adverse impact of denying female advisors equal career advancement and other employment opportunities on account of their gender.

72.     Amex's management has independently adopted, ratified, condoned and approved the discriminatory policies or practices identified herein.

73.     Amex's management has been aware of the practices of discrimination alleged herein and has failed to provide any reasonable avenue of complaint or otherwise to take reasonable measures to prevent such discrimination from occurring.

74.     By reason of Amex's discriminatory policies or practices as set forth in this Count, Plaintiffs and members of the Damages and Injunctive Class have suffered damages including, but not limited to, lost income, lost benefits, embarrassment, emotional distress, humiliation, indignity and a reduced quality of life.  Plaintiffs and members of the classes are threatened with further injury and loss which are irreparable in nature and for which they have no adequate remedy at law.

## COUNT II

### EMPLOYMENT DISCRIMINATION ON THE BASIS OF AGE -- INDIVIDUAL AND COLLECTIVE ACTION "OPT IN" CLAIMS FOR RELIEF

75.     Plaintiffs who are age 40 and above restate and reallege the allegations contained in Paragraphs 1 through 74 of this Complaint as though set forth here in full.

76.     Plaintiffs who are age 40 and above and similarly situated class members providing their written consent are applicants or employees of Amex within the meaning of 29 U.S.C. § 630 and other applicable civil rights laws prohibiting discrimination in employment on the basis of age.

77.     The discriminatory policies or practices of Amex, as set forth herein, deny Plaintiffs who are age 40 and above and similarly situated class members providing their written consent their right to equal employment opportunity on the basis of age in

violation of 29 U.S.C. § 621 *et seq.* and other applicable civil rights laws prohibiting discrimination in employment on the basis of age.

78.   Amex has adopted and/or maintained a system-wide policy or practice of age discrimination by, among other things, denying Plaintiffs age 40 and above and similarly situated class members providing their written consent equal opportunities with respect to numerous aspects of employment, including hiring, career advancement (including in performance appraisal, training, mentoring and promotional opportunities), distribution of leads and accounts, compensation and termination.

79.   Amex's discriminatory and unlawful employment practices identified above have been intentional, deliberate, willful and oppressive, and have been conducted in reckless and callous disregard for the rights of Plaintiffs age 40 and above and similarly situated class members providing their written consent.

80.   Amex's management has independently adopted, ratified, condoned and approved the discriminatory policies or practices identified above.

81.   Amex's management has been aware of the practices of discrimination alleged herein and has failed to provide any reasonable avenue of complaint or otherwise to take reasonable measures to prevent such discrimination from occurring.

82.   By reason of Amex's discriminatory policies or practices as set forth in this Count, Plaintiffs age 40 and above and similarly situated class members providing their written consent have suffered damage including, but not limited to, lost income, embarrassment, emotional distress, physical injury, humiliation, indignity and a reduced quality of life.  Plaintiffs age 40 and above and class members providing their written

consent are threatened with further injury and loss which is irreparable in nature and for which they have no adequate remedy at law.

## COUNT III

## EMPLOYMENT DISCRIMINATION ON THE BASIS OF EQUAL PAY -- INDIVIDUAL AND COLLECTIVE ACTION "OPT IN" CLAIMS FOR RELIEF

83.     Plaintiffs restate and reallege the allegations contained in Paragraphs 1 through 82 of this Complaint as though set forth here in full.

84.     The discriminatory policies or practices of Amex, as set forth herein, deny Plaintiffs and similarly situated class members providing their written consent compensation that is equal to similarly situated males in violation of 29 U.S.C. § 206(d) *et seq.* and other applicable civil rights laws prohibiting discrimination on the basis of pay.

85.     Amex has adopted and/or maintained a system-wide policy or practice of equal pay discrimination by, among other things, denying female advisors compensation that is equal to that of their male peers for performing the same or comparable work.

86.     Amex's management has independently adopted, ratified, condoned and approved the discriminatory policies or practices identified above.

87.     Amex's management has been aware of the practices of discrimination alleged herein and has failed to provide any reasonable avenue or complaint or otherwise to take reasonable measures to prevent such discrimination from occurring.

88.     By reason of Amex's discriminatory policies or practices as set forth in this Count, plaintiffs have suffered damage including, but not limited to, lost income, embarrassment, emotional distress, physical injury, humiliation and dignity, and a

reduced quality of life.  Plaintiffs and similarly situated class members providing their written consent are threatened with further injury and loss which is irreparable in nature and to which they have no adequate remedy at law.

### COUNT IV

### EMPLOYMENT DISCRIMINATION ON THE BASIS OF GENDER -- INDIVIDUAL NON-CLASS CLAIMS FOR RELIEF

89.     Plaintiffs restate and reallege the allegations contained in Paragraphs 1 through 88 of this Complaint as though set forth here in full.

90.     Amex has subjected one or more of the Plaintiffs to gender discrimination and other forms of discrimination which are outside the scope of Counts I through III, but which violate Title VII, and other applicable state and local civil rights laws prohibiting discrimination in employment on the basis of gender and retaliation including, but not limited to: a sexually hostile work environment, layoff, termination and constructive discharge.

91.     The discriminatory and unlawful employment practices described in Paragraph 90 have been intentional, deliberate, willful and oppressive, and have been conducted in reckless and callous disregard for the rights of Plaintiffs.

92.     Amex's management has independently adopted, ratified, condoned and approved the discriminatory practices described in Paragraph 90.

93.     Amex's management has been aware of the practices of discrimination described in Paragraph 90 and has failed to provide any reasonable avenue of complaint or otherwise to take reasonable measures to prevent such discrimination

94.     By reason of Amex's discriminatory practices as set forth in this Count, Plaintiffs have suffered damages including, but not limited to, loss of employment, lost income and benefits, embarrassment, emotional distress, physical injury, humiliation, indignity and a reduced quality of life.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectively pray:

1.     That this case be maintained as a class action on behalf of the proposed classes; that collective action opt-in procedures be adopted with respect to the claims asserted under the Age Discrimination in Employment Act and Equal Pay Act; that Plaintiffs be designated as representatives of the respective classes, and that their counsel of record be designated as Class Counsel;

2.     That the practices of Defendants complained of herein be determined and adjudged to be in violation of the rights of the Plaintiffs and the members of the classes under Title VII, the ADEA and the EPA.

3.     That a permanent prohibitory injunction be issued prohibiting Defendants, and their officers, agents, employees and successors from engaging in the employment practices complained of herein;

4.     That a permanent mandatory injunction be issued requiring that Defendants adopt employment practices in accord with the requirements of Title VII, the ADEA and the EPA;

5.     That judgment be entered in favor of Plaintiffs and the members of the Damages and Injunctive Class set forth herein, and against Defendants, for back pay

(including interest or an appropriate inflation factor), front pay, benefits and all other amounts owed to Plaintiffs and the members of the Damages and Injunctive Class;

6.      That the Plaintiffs and members of the Damages and Injunctive Class be awarded compensatory and punitive damages;

7.      That the Plaintiffs and members of the Damages and Injunctive Class age 40 and above and the Plaintiffs and members of the Damages and Injunctive Class who are victims of pay discrimination be awarded liquidated damages to the extent allowed by law;

8.      That the Plaintiffs and members of the classes be awarded such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable;

9.      That the Plaintiffs and members of the classes be awarded costs including, but not limited to, attorneys' fees pursuant to the common fund doctrine, experts' fees, and other costs and expenses of this litigation; and

10.      That the Court retain jurisdiction over Defendants until such time as it is satisfied that they have remedied the practices complained of and are determined to be in full compliance with the law.

## Jury Demand

If the settlement does not become final, Plaintiffs demand trial by jury on all issues triable of right by jury.

### Respectfully submitted,

Dated:  Janaury 17, 2002

_____//  S //_____.
Paul C. Sprenger (DC No. 412029)
Michael D. Lieder (DC No. 444273)
Steven M. Sprenger (DC No. 418736)
SPRENGER & LANG, PLLC
1614 Twentieth Street N.W.
Washington, DC  20009
(202) 265-8010
(202) 332-6652 (facsimile)

_____//  S //_____.
Maurice W. O'Brien
   (MN No 130229)
Nancy J. Miller (MN No 203518)
MILLER-O'BRIEN, PLLP
1208 Plymouth Building
12 South Sixth Street
Minneapolis, MN 55402
(612) 333-5831
(612) 342-2613 (facsimile)

_____//  S //_____.
Lawrence P. Schaefer (MN No. 195583)
Susan E. Stokes (MN No. 226725)
Mara R. Thompson (MN No.196125)
SPRENGER & LANG, PLLC
325 Ridgewood Avenue
Minneapolis, MN  55403
(612) 871-8910
(612) 871-9270 (facsimile)

ATTORNEYS FOR PLAINTIFFS
AND THE CLASSES