UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHELLEY KOSEN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:02CV00082 (HHK) |
| | ) | |
| AMERICAN EXPRESS FINANCIAL | ) | CLASS ACTION |
| ADVISORS, INC. ("AEFA"), IDS | ) | |
| FINANCIAL SERVICES, INC., | ) | |
| AMERICAN EXPRESS FINANCIAL | ) | |
| CORPORATION and AMERICAN | ) | |
| EXPRESS COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL
OF CONSENT DECREE AND
ORDER AND STIPULATION OF REFERENCE
APPOINTING SPECIAL MASTER**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................III

INTRODUCTION ............................................................................................ 1

BACKGROUND ............................................................................................. 1

I.     PROCEDURAL HISTORY. ...................................................................... 1

II.    SUMMARY OF THE TERMS ................................................................... 2

II.    SETTLEMENT TERMS. .......................................................................... 2

  A.   General Terms. ................................................................................... 2

  B.   Monetary Relief for Plaintiffs and Class Members. ................................ 3

  C.   Injunctive Relief Measures. .................................................................. 4

ARGUMENT .................................................................................................. 4

I.     CLASS COUNSEL HAS COMPLIED WITH THE NOTICE PROVISIONS. ..................... 4

II.    THE COURT SHOULD APPROVE THE TWO SETTLEMENT CLASSES ................ 6

  A.   The Proposed Settlement Classes Satisfy Rule 23(a). .............................. 6

    1.   The Proposed Classes Are so Numerous that Joinder of all Members Is Impracticable. 6

    2.   Questions of Law and Fact Are Common to the Classes. ........................... 7

    3.   The Plaintiffs' Claims Are Typical of the Class Claims. ........................... 8

    4.   Adequacy of Representation Is Satisfied. .............................................. 8

  B.   The Proposed Decree Satisfies Rule 23(b). ............................................ 9

  C.   The Opt-In Collective Actions. ........................................................... 11

III.   FINAL APPROVAL IS APPROPRIATE BECAUSE THE DECREE IS "FAIR,
       REASONABLE AND ADEQUATE." ......................................................... 11

  A.   The Relief to be Provided by AEFA to the Class Is Fair, Reasonable and Adequate. ..... 12

    1.   The Settlement Is the Result of Arms-Length Negotiations. ..................... 12

    2.   The Amount of the Settlement Is Fair, Reasonable and Adequate When
         Compared to the Strength of Plaintiffs' Case. ....................................... 13

    3.   Class Counsel Performed Sufficient Research and Analysis to Adequately
         Assess the Settlement Despite the Early Stage of the Proceedings. ............. 15

4.   The Reaction of the Class and Lack of Opposition Demonstrates that the Settlement Is Fair. ............................................................................................... 16

5.   Class Counsel Believe that the Settlement Is Fair, Reasonable and Adequate. .......... 17

B.   The Settlement Is Fair in its Allocation of Benefits Between Plaintiffs and Class Members. ............................................................................................. 18

C.   The Requested Award of Attorneys' Fees and Expenses Is Fair, Reasonable and Adequate. ............................................................................................. 20

1.   Class Counsel Seeks Under 28% of the Settlement Fund Allocable to Fees for Work Already Performed in the Case. .................................................................. 21

2.   A Fee Award of 27.6% for Work Already Performed Is Fair and Reasonable. .......... 23

a.   The size of the fund created and the number of persons benefited. ........................ 24

b.   The presence or absence of substantial objections by members of the class to the settlement and/or the requested fees. .................................................... 25

c.   The skill and efficiency of the attorneys involved. ................................................. 25

d.   The complexity and duration of the litigation. ....................................................... 26

e.   The risk of nonpayment. .......................................................................................... 28

f.   The amount of time devoted to the case by plaintiffs' counsel. .............................. 29

g.   The awards in similar cases. .................................................................................... 31

IV.   THE COURT SHOULD ENTER THE STIPULATION AND ORDER OF SPECIAL REFERENCE. ............................................................................. 32

CONCLUSION ......................................................................................................... 33

# TABLE OF AUTHORITIES

**Cases**

Allison v. Citgo Petroleum Corp., 151 F.3d 402 (5th Cir. 1998).......................................... 26, 27

Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997)................................................. 8, 10, 22

Columbus-America Discovery Group v. Atlantic Mutual Insurance Co., 203 F.3d 291
   (4th Cir. 2000) ................................................................................................................. 32

Cook v. McCarron, 1997 U.S. Dist. LEXIS 1090 (N.D. Ill. Jan. 30, 1997)............................... 28

De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225 (7th Cir. 1983).................................... 8

Elliott v. Sperry Rand Corp., 680 F. 2d 1225 (8th Cir. 1982)................................................... 23

Emery v. Hunt, 132 F. Supp. 2d 803 (D.S.D. 2001) ................................................................ 28

**    Eubanks v. Billington, 110 F.3d 87 (D.C. Cir. 1997) .................................................... 9

Frazier v. Consolidated Rail Corp., 851 F.2d 1447 (D.C. Cir. 1988) ........................................ 6

Gunter v. Ridgewood Energy Corp., 223 F.3d 190 (3rd Cir. 2000).......................................... 27

Hammon v. Barry, 752 F. Supp. 1087 (D.D.C. 1990)................................................................ 12

Hyman v. First Union Corp., 982 F. Supp. 1 (D.D.C. 1997) ..................................................... 11

In re Aetna Inc. Sec. Litig., 2001 U.S. Dist. LEXIS 68 (E.D. Pa. Jan. 4, 2001) ................. 23, 31

In re Agent Orange Prod. Liability Litigation, 818 F.2d 1245 (2d Cir. 1987) ........................... 19

In re Airline Ticket Comm'n Antitrust Litig., 953 F. Supp. 280 (D. Minn. 1997) ..................... 23

In re Ampicillin Antitrust Litig., 526 F. Supp. 494 (D.D.C. 1981)............................................ 23

In re APAC Teleservices, Inc. Sec. Litig., 1999 U.S. Dist. LEXIS 17908 (S.D.N.Y. Dec. 10,
   2001)................................................................................................................................. 27

In re Combustion, Inc., 968 F. Supp. 1116 (W.D. La. 1997) ..................................................... 23

In re Corrugated Container Antitrust Litigation, 643 F.2d 195 (5th Cir. 1981).......................... 19

In re Drexel Burnham Lambert Group, Inc., 130 B.R. 910 (S.D.N.Y. 1991), *aff'd*,
   960 F.2d 285 (2d Cir. 1992)............................................................................................... 20

In re Inter-Op Hip Prosthesis Liab. Litig., 204 F.R.D. 359 (N.D. Ohio Aug. 29, 2001)............. 18

**    In re Lorazepam & Clorazepate Antitrust Litig., 205 F.R.D. 369
   (D.D.C. 2002) (Hogan, C.J.) ...................................................................................... *seriatim*

In re Merry-Go-Round Enterprises, Inc., 244 B.R. 327 (Bankr D. Md. 2000) ........................... 31

** In re Newbridge Networks Sec. Litig., 1998 WL 765724, 1998 U.S. Dist. LEXIS 23238 (D.D.C. Oct. 23, 1998) .................................................. *seriatim*

In re Rite Aid Corp. Sec. Litig., 146 F. Supp. 2d 706 (E.D. Pa. 2001) ..................................... 31

In re Safety Components Int'l Inc. Sec. Litig., 166 F. Supp. 2d 72 (D.N.J. Sept. 27, 2001) ...... 27

** In re Vitamins Antitrust Litig., 1999 U.S. Dist. LEXIS 21963 (D.D.C. July 19, 2001) ............................................................................ *seriatim*

Jenson, et al. v. Eveleth Taconite Company, 139 F.R.D. 657 (D. Minn. 1991) ............................ 14

Lambert v. American Express Financial Corp., Civ. File No. 99-CV-493 (JMR/SRN) (D. Minn.) ......................................................................... 17

Maley v. Del Global Technologies Corp., 186 F. Supp. 2d 358 (S.D.N.Y. 2002) ..................... 27

Mangone v. First USA Bank, 206 F.R.D. 222 (S.D. Ill. 2001) ................................................... 25

Martens v. Smith, Barney, Inc., 181 F.R.D. 243 (S.D.N.Y. 1998) ............................................... 7

** McLaurin v. National Railroad Passenger Corp. C.A. No. 98-2019 (D.D.C. 1999) ............................................................................ 21, 22, 23, 31

Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999) ...................................................................... 10

Osher v. SCA Realty I, Inc., 945 F. Supp. 298 (D.D.C. 1996) ................................................. 12

Petrovic v. Amoco Oil, Co., 200 F.3d 1140 (8th Cir. 1999) ...................................................... 14

** Pigford v. Glickman, 185 F.R.D. 82 (D.D.C. 1999) ........................................................... 13, 17

Robinson v. Metro-North Commuter Railroad Co., 267 F.3d 147 (2d Cir. 2001) ..................... 26

Salazar v. District of Columbia, 123 F. Supp. 8 (D.D.C. 2000) ............................................... 31

Schwartz v. Dallas Cowboys Football Club, Ltd., 157 F. Supp. 2d 561 (E.D. Pa. 2001) ......................................................................... 18

Shelton v. General Motors Corp., 860 F.2d 250 (7th Cir. 1988) ............................................. 28

** Swedish Hospital Corp. v. Shalala, 1 F.3d 1261 (D.C. Cir. 1993) ................................. 21, 23, 29

Taylor v. D.C. Water & Sewer Authority, 205 F.R.D. 43 (D.D.C. 2002) ....................... 9, 15, 27

Thomas v. Albright, 139 F.3d 227 (D.C. Cir. 1998) ....................................................... 12, 13, 15

Thomas v. Christopher, 169 F.R.D. 224 (D.D.C. 1996) ........................................................ 7, 8

Thomas v. Powell, 247 F.3d 260 (D.C. Cir. 2001) ..................................................................... 9

** Thornton v. National Railroad Passenger Corp., C.A. No. 98-890 (D.D.C. 2000) ............................................................................ 21, 23, 31

Vizcaino v. Microsoft Corp., 2002 U.S. App. LEXIS 9188 (May 15, 2002)........................ 25, 28

Weil v. Long Island Savings Bank, 188 F. Supp. 2d 258; 2002 U.S. Dist. LEXIS 8429
    (E.D.N.Y. Jan. 16, 2002).................................................................................................. 25

Wells v. General Elec. Co., 78 F.R.D. 433 (E.D. Pa. 1978) ........................................................ 7

**Statutes**

29 U.S.C. § 206(d) ("Equal Pay Act")................................................................................. 1, 6, 11

29 U.S.C. § 621 ("Age Discrimination in Employment Act") .......................................... 1, 6, 11

42 U.S.C. § 2000 ("Title VII") ............................................................................................... 1, 15

**Other Authorities**

5 Moore's Federal Practice § 23.22[3][a] (Matthew Bender 3d ed. 1998) ................................... 6

**Rules**

Fed. R. Civ. P. 23 ...................................................................................................... 6, 9, 10, 22

Fed. R. Civ. P. 53 ............................................................................................................... 32

Fed. R. Civ. P. 54 ............................................................................................................... 32

## INTRODUCTION

Plaintiffs file this unopposed motion seeking final approval of a negotiated class settlement that will provide class members with substantial injunctive and monetary relief. Two months ago this Court granted its preliminary approval to the settlement with American Express Financial Advisors, Inc. and related entities ("AEFA"). Since then, notice was given to over 4,000 members of the two settlement classes. *Not one of them has objected* to the settlement. About one-half of one percent have filed opt-out notices. Hundreds are filing claim forms. The unanimity of this response provides strong evidence that this settlement benefits the classes, is fair and reasonable in all respects, and should be approved.

The approval process requires four judicial decisions. For the reasons set forth below, the Court should conclude that the parties have complied with the provisions concerning notice, approve the two proposed settlement classes, approve the Consent Decree setting out the terms of the settlement, and pursuant to the terms of that Consent Decree enter an order appointing a special master to resolve any disputes over the parties' compliance with the terms of the Decree.

## BACKGROUND

## I.    PROCEDURAL HISTORY.

The procedural history of this litigation before preliminary approval and the terms of the Consent Decree are described in detail in the Memorandum in Support of Preliminary Approval (Prelim. Mem.) at pp. 1-5. We do so more briefly here.

This litigation began on October 4, 1999, when four women filed charges with the Equal Employment Opportunity Commission against AEFA alleging class-wide gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII"), as amended and the Equal Pay Act, 29 U.S.C. § 206(d) *et seq.* Two of the charges also alleged class-wide age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* Over the course of the following 18 months, thirteen additional women filed similar charges and are plaintiffs in this action. (Declaration of Class

Counsel Lawrence Schaefer executed January 22, 2002, at ¶ 3 ("Schaefer Decl.") (copy filed herewith).)

The parties entered settlement negotiations in 2000 before a complaint was filed. Prior to and during the negotiations, which lasted about a year, the parties engaged in an exhaustive exchange of information, similar to what would have occurred in the discovery period preceding a comprehensive class certification motion and trial before this Court, and analysis of the information exchanged, much of it conducted by recognized statistical experts analyzing company-wide computer data. (*Id*. at ¶ 4.) The negotiations were facilitated by a skilled mediator, Linda Singer, Esq., of ADR Associates. (*Id*. at ¶ 5.) These extraordinary mediation efforts culminated in January 2002, when the parties agreed to, executed, and filed a Consent Decree ("Decree") and related documents.

## II.    SETTLEMENT TERMS.

### A.    General Terms.

The settlement will create two classes:

> As to Injunctive Relief Alone:  All women who applied to work for or otherwise become affiliated with and who were rejected by American Express Financial Advisors, Inc. for positions as Financial Advisors at any time between December 8, 1998 and March 20, 2002 ("Injunctive Class").

> As to Damages and Injunctive Relief:  All women employed by or otherwise affiliated with American Express Financial Advisors, Inc. as Financial Advisors at any time between December 8, 1998 and March 20, 2002 ("Damages Class").

The Injunctive Class is provided with injunctive relief only in the proposed settlement. Its members remain free to pursue any damage claim against defendants. Injunctive Class members were not permitted to opt out of the Settlement.

The Damages Class is provided with injunctive relief and its members, if they timely file a claim form, may receive a monetary award. Damages Class members were permitted to opt out of the monetary portion of the settlement by timely filing a notice.

The term of the Decree is four years, which may be extended only as provided in the Consent Decree or by order of the Court if warranted under applicable law. During the four-year

term, AEFA will regularly report to, and meet with, Class Counsel about its compliance with Decree obligations.  If AEFA fails to carry out any of its obligations, Class Counsel may bring an enforcement action following attempted voluntary resolution of the dispute.   Any such enforcement action would be brought before a special master, whose identity the parties have already agreed to.

### B.     Monetary Relief for Plaintiffs and Class Members.

The Decree provides that AEFA will pay Thirty-One Million Dollars ($31,000,000), plus interest, into a Settlement Fund to pay the claims of plaintiffs, members of the Damages Class, and attorneys' fees and costs.  Seventeen Million Five Hundred and Fifty Thousand Dollars ($17,550,000), plus allocable interest and earnings, will be devoted to the settlement of the claims of plaintiffs and class members and will be called the "Claims Portion."  A "Business Development Portion" amounting to Two Million Six Hundred Thousand Dollars ($2,600,000), plus allocable interest and earnings, will be used to assist current financial advisors in developing new business.  A "Monitoring Portion" of Ten Million Eight Hundred and Fifty Thousand Dollars ($10,850,000), plus allocable interest and earnings, will be set aside to pay Class Counsel and Payees, as defined in Section III of the Decree, for attorneys' fees and expenses both for past and future services rendered, including the administration of the Settlement Fund and the monitoring (and if necessary enforcement) of AEFA's performance of its duties under the Decree over its four-year term.

The allocation of awards from the Claims and Business Development Portions to plaintiffs and class members shall be based on formulas that Class Counsel will recommend and submit to the Court for approval.  The Administrators shall arrive at the proposed formula for distribution of the Claims Portion after reviewing claim forms submitted by plaintiffs and class members.

The Business Development Portion will be allocated among current financial advisor class members based on a formula, which may but need not be a per capita distribution, to be

proposed to the Court.  Business Development Claimants may submit requests for advancement or reimbursement of business development expenses over the term of the Consent Decree.

### C.     Injunctive Relief Measures.

The Decree directly addresses the problems that led to this lawsuit.  The Decree provides that AEFA shall, among other changes:  (1) agree to hiring goals that will, if met, escalate the percentage of women in the financial advisor ranks to well above the industry average; (2) revise the process of distributing "leads" to all financial advisors in a manner that ensures these leads are distributed equitably and without regard to gender; (3) revise the process of distributing accounts to all financial advisors in a manner that ensures these accounts are distributed equitably and without regard to gender; (4) commit to frequent and thorough training sessions for managers and employees; (5) adopt uniform and objective criteria for promoting employees, commit to interviewing at least two female applicants who meet the minimum posted job qualifications for each position, and implement an automatic review process for approving promotions to designated positions; (6) revise posting procedures for jobs and create electronically accessible postings; (7) create a "Field Diversity Officer" position whose responsibilities include monitoring and enforcing many of the Decree obligations; (8) create an internal mentoring system designed to assure that all class members seeking mentoring receive it from appropriate individuals; and (9) revamp its EEO complaint and investigation procedures.

Class Counsel will monitor AEFA's compliance with its commitments, based on reports and information that AEFA is required to provide to Class Counsel on a semi-annual basis.

## ARGUMENT

## I.     CLASS COUNSEL HAS COMPLIED WITH THE NOTICE PROVISIONS.

When this Court granted preliminary approval of the settlement on March 20, 2002, it also approved three means for giving members of the settlement classes notice of the proposed settlement.  As shown below, Class Counsel has fully complied with the Court's directions regarding mailed, published, and Internet notice.

On March 25, 2002, AEFA supplied to Class Counsel the names and last known addresses of all female financial advisors (current and former) who worked at AEFA at any time during the proposed class period, between December 8, 1998 and March 25, 2002. This list contained information about 4,111 women and comprised the entire universe of potential Damages Class members. (Declaration of Mara Thompson executed May 30, 2002 ("Thompson Decl."), ¶ 7.) On March 29, 2002, Class Counsel's vendor, Rust Consulting, Inc., mailed copies of the notice, claim form, and instructions approved by the Court (the "notice package") to each person on the list provided by AEFA. (*Id.* at ¶ 9 ; Ness Decl., ¶ 8.) Only 106 of the notice packages were returned to Rust as undeliverable. (Ness Decl., ¶ 9.) Rust searched for and located updated address information and resent the notice package to 67 Damages Class members. As of May 30, 2002, there are thus only 39 Damages Class members, about one percent of the total class, for whom Rust does not have what appear to be accurate addresses. (*Id.*, ¶ 9.) Class Counsel also directed Rust to send the notice package to any one, whether on the AEFA-produced list or not, who contacted Class Counsel or Rust and requested a claim form. (Thompson Decl., at ¶ 12.) As of May 30, 2002, Rust had mailed 10 notice packages to persons not on the list provided by AEFA. (Ness Decl., ¶ 13.)

In order to accomplish the best possible and most effective notice to Injunctive Class members as well as to Damage Class members, Class Counsel published notice of the proposed settlement in the form approved and required by the Court in the *Wall Street Journal* on April 8, 2002, and April 15, 2002. On April 8, 2002 and April 15, 2002, Class Counsel also published notice of the proposed settlement in *Investment News*, a publication widely read in the financial industry. (Thompson Decl., ¶ 13; Ness Decl., ¶ 10.) The combined circulations of these two publications is 1,960,239 readers. (Ness Decl., ¶ 10.)

Finally, Class Counsel established and created a website entitled amexgendercase.com, which contained detailed information related to the proposed settlement. On this website, a visitor can view and/or download the Complaint, the Plaintiffs' Unopposed Motion for Issuance of an Order Granting Preliminary Approval, the Order Granting Preliminary Approval, the

Administrative Order, the Claim Form and its Instructions, the Mailed Notice, and the Published Notice.  This website was activated on February 21, 2002.  (Thompson Decl., ¶ 14.)  Class Counsel also created a link to the amexgendercase.com website on their firm websites, http://www.sprengerlang.com and http://www.miller-obrien.com.  (*Id.*)  These websites are cited in the mailed and published notice.

The Court should find that Class Counsel complied with every provision in the settlement concerning notice.  Indeed, the evidence suggests that virtually every member of the Damages Class received notice.

## II.   THE COURT SHOULD APPROVE THE TWO SETTLEMENT CLASSES.

On March 20, 2002, this Court concluded that the two proposed settlement classes appeared to satisfy all of the requirements of Rule 23 and granted preliminary approval.  As part of the final approval process, this Court should conclude that they do indeed meet the requirements and certify the classes.

The Court also preliminarily approved opt-in classes under the ADEA and the Equal Pay Act.  Those preliminarily approved actions should be finally approved as well.

### A.   The Proposed Settlement Classes Satisfy Rule 23(a).

Under Rule 23(a) of the Federal Rules of Civil Procedure, a class may be certified when "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).   The proposed classes meet each of these requirements.

#### 1.   The Proposed Classes Are so Numerous that Joinder of all Members Is Impracticable.

Courts generally agree that classes with 40 or more members satisfy the numerosity requirement.  *See 5 Moore's Federal Practice* § 23.22[3][a] (Matthew Bender 3d ed. 1998); *Frazier v. Consolidated Rail Corp.*, 851 F.2d 1447, 1456 n.10 (D.C. Cir. 1988).  Based upon all the computerized employment and payroll data reviewed in arriving at the proposed settlement,

the parties agree that the proposed Damages Class consists of more than 4,000 financial advisors. (Thompson Decl., ¶¶ 6-7 The number of rejected applicants is unknown, but clearly well in excess of 100 class members.  The proposed classes meet the numerosity requirement.

### 2.      Questions of Law and Fact Are Common to the Classes.

The proposed injunctive relief shows that the claims of all members of the Damages Class raise numerous common issues, as do the claims of all members of the Injunctive Class. AEFA does business and maintains the same employment practices and policies in much the same way at all of its locations.  All of the potential Damages Class members were subjected to the same employment policies and practices during their tenure as financial advisors with AEFA, whether they are current or former AEFA employees, and all of the Injunctive Class members were subjected to similar hiring practices that resulted in their rejection for the same position, financial advisor.

The similarity of practices and situations results in claims giving rise to a number of factual and legal issues common to members of each class, some of which are set forth in the Complaint at paragraph 53.  The commonality requirement is therefore satisfied.  *See Martens v. Smith, Barney, Inc.,* 181 F.R.D. 243, 259 (S.D.N.Y. 1998) (alleged pattern of discriminatory treatment of women that is traced to centralized failure to address and remedy widespread discrimination satisfies commonality and typicality requirements); *Thomas v. Christopher*, 169 F.R.D. 224, 237 (D.D.C. 1996) (holding that commonality requirement is satisfied when "key personnel procedures are centrally administered, highly subjective, and applicable to all class members throughout their careers"), *aff'd in relevant part, rev'd in part* 139 F.3d 227 (D.C. Cir. 1998); *Wells v. General Elec. Co.*, 78 F.R.D. 433, 438 (E.D. Pa. 1978) ("[A] nationwide class action may be appropriately maintained where defendant formulates a policy which is uniformly applied to all employees within the class.").  The nature of the injunctive relief, which affects all class members, also shows that the problems and their solutions are common to all class members.

### 3.      The Plaintiffs' Claims Are Typical of the Class Claims.

The Rule 23(a) typicality requirement is met if the named plaintiffs' claims "arise from the same event or practice or course of conduct that gives rise to the claims of other class members and ... are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (quotations omitted); *see also Thomas v. Christopher*, 169 F.R.D. 224 at 238 (holding that typicality requirement is satisfied when commonality requirement is satisfied and the plaintiffs have experienced the same types of adverse actions complained of for the class).  Here, all class members' claims arise from AEFA's employment policies and practices.

The 15 plaintiffs who are the representatives of the Damages Class are or were employed by AEFA between December 8, 1998, and the date of preliminary approval, and shared the same or similar job classification.  The advancement, compensation, termination and hostile environment claims of the representative plaintiffs all are typical of those of class members because the same policies and procedures governed the employment of each potential member of the proposed settlement class.  The two plaintiffs who are representatives of the Injunctive Class applied for positions as financial advisors between December 8, 1998 and the date of preliminary approval and were rejected under the same policies and practices that resulted in the rejection of other class members.

### 4.      Adequacy of Representation Is Satisfied.

Class representation is adequate if class counsel is competent and there are no potential conflicts of interest between class representatives and the remaining class members.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-27 (1997).  Class Counsel is composed of competent and experienced employment class action litigators who have vigorously represented the interests of the members of the two classes in this matter.  (Schaefer Decl. at ¶¶ 16-18.)

Further, the interests of the named plaintiffs and the other potential class members do not conflict.  The representative plaintiffs have similar claims to those of members of the proposed

settlement classes and do not face unique overriding defenses.  They have fairly and adequately represented the interests of the classes in this case.  (*Id.* at 3, 6.)

### B.    The Proposed Classes Satisfy Rule 23(b).

Each of the two proposed classes also must satisfy the provisions of at least one of the three subsections of Rule 23(b).  They meet this requirement.

The Injunctive Class satisfies the requirements of Rule 23(b)(2), which requires that the defendant have acted on grounds generally applicable to the class, making appropriate final injunctive relief with respect to the class as a whole.  Here, AEFA's job selection policies and practices resulted in the rejection of the employment applications of all members of the proposed Injunctive Class.  Injunctive relief not only is warranted to benefit all members of the class who may choose to apply in the future, but has already been agreed to.

The Damages Class should be approved pursuant to Rule 23(b)(2) as to all issues necessary to obtain injunctive relief and pursuant to Rule 23(b)(3) as to all additional issues necessary to obtain monetary relief.  Approval of classes under both subsections is consistent with Fed. R. Civ. P. 23(c)(4), which permits cases to be maintained as a class action with respect to particular issues, and has been approved by the D.C. Circuit.  *Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997) (permitting district court to "adopt a 'hybrid' approach, certifying a (b)(2) class as to the claims for declaratory or injunctive relief, and a (b)(3) class as to the claims for monetary relief, effectively granting (b)(3) protections including the right to opt out to class members at the monetary relief stage"); *see also Thomas v. Powell*, 247 F.3d 260, 265 & n.2 (D.C. Cir. 2001) (noting that district court did not enter findings necessary to establish a (b)(2)/(b)(3) hybrid class, while accepting premise that classes could, if properly supported, be certified under both clauses); *Taylor v. D.C. Water & Sewer Authority*, 205 F.R.D. 43, 48-49 (D.D.C. 2002) (Kennedy, J.) (refusing to dismiss class certification allegations because D.C. Circuit law permits hybrid (b)(2)/(b)(3) certifications).

It is appropriate to approve the Damages Class in part under Rule 23(b)(2) because of the comprehensive equitable relief sought and obtained by the terms of the settlement concerning

many of AEFA's employment policies and practices.  This relief, which Class Counsel believes is at least as valuable as the monetary relief, applies to and will benefit all female financial advisors at AEFA.  The lack of objections reflects a willingness of the class members to be bound to the terms of the injunctive relief.

The Damages Class should be approved under Rule 23(b)(3) insofar as class members seek and have collectively obtained monetary relief because common issues would predominate over purely individualized issues in the litigation over damages.  The issues that give rise to the wide-ranging equitable relief are common to all members of the Damages Class.  Although these common issues would have a major impact on any litigation over the appropriate measure of monetary relief for each class member, each class member's damages claim also would be influenced by purely individual facts.  For example, compensation among class members has varied substantially, and some class members have sought promotions to managerial positions while others have not.  These differences would cause substantial variations in the likelihood of success and the size of the recoveries of class members if their claims were litigated separately.  By the very nature of an allocation formula, those variations will be only partly captured by the formula.  Accordingly, the parties anticipated that some class members would believe, and apparently a small number of class members do believe, that they would be entitled to damages beyond those that might be afforded under this settlement.  By certifying the class to pursue monetary relief under Rule 23(b)(3), the Court afforded these class members the opportunity to opt out.  (Schaefer Decl., ¶ 10.)  Class members' rights to exercise control over the damages aspects of their claims thus have been protected.  *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).[1]

---

[1]  Rule 23(b)(3) also requires that, to be approved, "a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy."  The Supreme Court, however, has held that this superiority requirement is irrelevant in the context of a settlement class.  *See Amchem*, 521 U.S. at 620.

C.      The Opt-In Collective Actions.

Persons may opt in to an action brought under the Equal Pay Act or the ADEA if they are "similarly situated" to the plaintiffs and signify their consent to join the lawsuit. Both criteria are met here, and hence the collective actions should be approved.

There is no single accepted test for whether employees are similarly situated, but factors considered include similarity of positions, similarity of claim, and similarity of policies and practices giving rise to the claims. *See Hyman v. First Union Corp.*, 982 F. Supp. 1 (D.D.C. 1997). All factors are satisfied here.

All fifteen of the plaintiffs who are or were financial advisors assert claims under the Equal Pay Act that they have been paid less than similarly situated males. Other female financial advisors are similarly situated to the plaintiffs: they all filled the same positions, the types of compensation available to financial advisors were the same for all of them, and the policies and practices that determined compensation were the same for all of them.

Eight of the fifteen plaintiffs who are or were financial advisors assert claims of "gender plus age" discrimination in violation of the ADEA. Other women who are or were at least forty years of age when working as financial advisors are similarly situated to the eight plaintiffs: they all filled the same positions and were subject to the same personnel policies and practices.

The mailed notice informed members of the Damages Class of their opportunity to opt in to the Equal Pay Act and ADEA actions, and the claim form gave them an opportunity to do so. By responding in the affirmative to either or both questions on the claim form and by signing the claim form, a claimant signified her written consent to join these actions. Hence, both requirements for approval of the collective actions have been satisfied.

III.    **FINAL APPROVAL IS APPROPRIATE BECAUSE THE DECREE IS "FAIR, REASONABLE AND ADEQUATE."**

The Court should determine whether the settlement is fair, reasonable and adequate by evaluating three criteria: is the quantum of relief provided by AEFA to the class fair, reasonable, and adequate; is the plan for distribution of that relief among plaintiffs and class members fair;

and is the compensation to Class Counsel fair and reasonable.[2]   Although courts must scrutinize class action settlements carefully, they do so in light of the judicial preference favoring settlements, *In re Lorazepam & Clorazepate Antitrust Litig.* ("*Lorazepam*"), 205 F.R.D. 369, 375 (D.D.C. 2002) (Hogan, C.J.),[3] which is especially strong in the context of class actions "given the litigation expenses and judicial resources required in many such suits."  *Osher v. SCA Realty I, Inc.*, 945 F. Supp. 298, 304 (D.D.C. 1996); *accord Hammon v. Barry*, 752 F. Supp. 1087, 1100 (D.D.C. 1990) ("particularly in class action suits, there is an overriding public interest in favor of settlement").

### A.    The Relief to be Provided by AEFA to the Class Is Fair, Reasonable and Adequate.

The following factors should guide this Court in determining whether the relief to be provided by AEFA to the class is fair, reasonable and adequate:

> (a) whether the settlement is the result of arms-length negotiations; (b) the terms of the settlement in relation to the strength of plaintiffs' case; (c) the stage of the litigation proceedings at the time of settlement; (d) the reaction of the class; and (e) the opinion of experienced counsel.

*Lorazepam*, 205 F.R.D. at 375 (citing *Thomas v. Albright*, 139 F.3d 227, 231-33 (D.C. Cir. 1998), and numerous district court opinions)).  As set forth below, under these factors the Court should conclude that the quantum of relief to the class is fair, reasonable, and adequate.

### 1.    The Settlement Is the Result of Arms-Length Negotiations.

"A 'presumption of fairness, adequacy and reasonableness attaches to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery.'"  *Lorazepam*, 205 F.R.D. at 376 (quoting *In re Vitamins Antitrust Litig.*, 1999 U.S. Dist. LEXIS 21963, at *2 (D.D.C. July 19, 2001).  The settlement before this Court is the product of extensive arms-length negotiations by experienced counsel, undertaken in good faith after

---

[2]   In *In re Lorazepam & Clorazepate Antitrust Litig.* ("*Lorazepam*"), 205 F.R.D. 369 (D.D.C. 2002), Chief Judge Hogan also considered the reasonableness of the amount allocated to notice costs and claims administration.  *Id.* at 382.  Under the settlement here, those costs will be paid out of the attorneys' fee award, so need not be considered separately.  (See page __ below.)

[3]   The decision in *Lorazepam* was issued after preliminary approval of the settlement in this case.

substantial factual investigation and analysis of a massive amount of AEFA's computerized data. Counsel conducted lengthy and adversarial negotiations, involving ten face-to-face mediations and numerous telephone conferences over a period of nearly two years, and they exchanged numerous proposals and drafts of the Consent Decree and each accompanying document before reaching the current settlement.    (Schaefer Decl., ¶¶ 4-6.)    The settlement is therefore presumptively fair, reasonable and adequate.

> **2.      The Amount of the Settlement Is Fair, Reasonable and Adequate When Compared to the Strength of Plaintiffs' Case.**

In assessing the fairness, adequacy and reasonableness of a settlement, "by far the most important factor is a comparison of the terms of the compromise or settlement with the likely recovery the plaintiffs would realize if the case went to trial." *Pigford v. Glickman,* 185 F.R.D. 82, 91 (D.D.C. 1999); *see also Thomas v. Albright,* 139 F.3d at 231 (courts' primary task is to evaluate the terms of the settlement in relation to the strength of the plaintiffs case).  In this case, this comparison mandates final approval as the settlement provides significant injunctive and monetary relief to class members, while continuing this litigation would entail significant risk.

As discussed above, the injunctive relief is comprehensive.  The provisions address every significant issue raised by the plaintiffs in the Complaint:  hiring, lead and account assignments, mentoring programs, interview and job selection procedures, pay, EEO investigative techniques and corporate accountability, harassment, termination, and diversity training.  Changes like these could have been obtained only through negotiations.  They go beyond the relief that typically is awarded by courts after trials in employment discrimination class cases. (Schaefer Decl., ¶ 7.)

Likewise, the $31,000,000 monetary fund provided in this settlement will adequately compensate members of the Damages Class for any claimed losses.  The amount in this fund is the product of lengthy and hard fought negotiations; the result reflects a compromise reflecting the risks inherent to both sides if the case were not settled.  (*Id.*, ¶¶ 8, 13.)  It is, to the best of our knowledge, one of the ten largest awards ever in a gender discrimination class case.  (Thompson Decl., ¶ 15.)  Several of the cases with larger awards have had significantly larger classes that

had to share the award than the approximately 4,100 members of the Damages Class here, so that the average awards will likely be larger here.  (*Id.*)

It is true that the settlement does not provide any monetary relief to members of the Injunctive Class, but the absence of monetary relief does not harm them in any way, because the terms of the Consent Decree do not bar them from initiating suits seeking monetary relief and the statute of limitations has been tolled while the negotiations have proceeded.  Class Counsel could not negotiate a fair monetary settlement for members of this class because the state of defendants' records concerning the application process were such as to make class wide monetary relief impracticable to achieve.  (Schaefer Decl., ¶ 11.)

This relief obtained for members of both classes warrants approval of the settlement when measured against the likely outcome if this case were litigated.  The plaintiffs and class members, as well as defendants, faced substantial risk factors in this case in addition to the risks, expenses and delay normally associated with employment discrimination class actions.[4] Plaintiffs cannot describe them fully in this memorandum in case the settlement is not effectuated for any reason and litigation ensues, but even a brief description is sufficient to flag these risks.

First, AEFA classified many of the proposed class members as independent contractors and not employees during much of the time involved in the class period.  The federal anti-discrimination laws protect only employees.  The issue whether they were employees, at least for purposes of federal anti-discrimination laws, and the reach of Minnesota law (which does protect independent contractors) would have been vigorously contested.  The outcome of these contests

---

[4]    Both sides recognize that, regardless of the outcome, litigation would be protracted and expensive, especially if the litigation proceeded through a full-scale liability trial and a large number of individual damages hearings.  *See Petrovic v. Amoco Oil, Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999) (holding that the anticipated length and complexity of further litigation is an important factor to consider in determining whether to approve a settlement).  In a successful class action case involving less than *one percent* of the number of class members potentially affected here, Sprenger & Lang pursued the litigation for over eleven years before settling it on the eve of a fourth trial.  (Schaefer Decl. at ¶ 17) (describing *Jenson, et al. v. Eveleth Taconite Company,* 139 F.R.D. 657 (D. Minn. 1991) (decision certifying a class), 824 F. Supp. 847 (D. Minn. 1993) (decision finding class-wide liability), 130 F.3d 1287 (8th Cir. 1997) (decision overturning inadequate damage awards and establishing full scope of damages women can recover in these cases).

could have dramatically affected the size of the potential Damages Class and the amount of the potential recovery.  (*Id.*, ¶ 9.)[5]

Second, the proposed Damages Class encompasses over 4,000 financial advisors who have worked throughout the country at numerous locations.  Proving the necessary centralized control over the personnel practices at issue, as well as the pattern of discrimination necessary to certify a nationwide class and successfully establish class liability, posed significant risks.  (*Id.*)

Third, Title VII was amended in 1991 to permit, subject to certain caps, recovery of compensatory and punitive damages instead of just economic losses.  The plaintiffs intended to seek recovery of compensatory and punitive damages on behalf of class members should litigation commence.  (*Id.* at ¶¶ 8-9.)  Although the D.C. Circuit and this Court have made clear, in contrast to several other courts, that seeking such damages is not a per se bar to class certification, seeking such damages would have made certification more problematic.  *See Thomas v. Albright*, 139 F.3d at 227; *Taylor v. D.C. Water & Sewer Authority*, 205 F.R.D. 43.

### 3.   Class Counsel Performed Sufficient Research and Analysis to Adequately Assess the Settlement Despite the Early Stage of the Proceedings.

As Judge Hogan noted, "Early settlement of these types of cases is encouraged." *Lorazepam*, 205 F.R.D. at 377.  However, when a case is settled early, a court must consider "whether counsel had sufficient information . . . to reasonably assess the risks of litigation vis-à-vis the probability of success and range of recovery."  *Id.*

In this case, counsel obtained the necessary information in four ways.  First, they obtained information from class members and other witnesses.  They had contact with over 560 witnesses, conducted about 90 extensive interviews, and prepared 45 declarations summarizing the information obtained, in addition to regularly conferring with the named plaintiffs.  (Thompson

---

[5]   In early 2001, Judge Rosenbaum of the United States District Court for the District of Minnesota, in a case brought on behalf of all AEFA financial advisors alleging violations of ERISA, expressed skepticism concerning the issue that the financial advisors were employees instead of independent contractors.  The case, *Lambert v. American Express Financial Corp.*, Civ. File No. 99-CV-493 (JMR/SRN) (D. Minn.), settled shortly afterward, without Judge Rosenbaum having to decide the issue.  (Schaefer Decl., ¶ 9.)

Decl., ¶ 3.)  Second, prior to and during the negotiation process, they obtained information about AEFA's policies and AEFA's computerized personnel information from the defendant, the same type of information that could have been obtained if the parties had proceeded to litigation only through a series of document production requests and depositions.  (Schaefer Decl., ¶ 4.)  Third, they engaged a recognized statistical expert who analyzed AEFA's data and prepared a series of analyses, provided the results of those analyses to AEFA, and received from AEFA a summary of the results of the analysis performed by the company's expert.  (*Id.*)  Finally, many of the most difficult issues, such as whether the financial advisors were employees or independent contractors and whether Minnesota law would have extended beyond the state's borders, were largely legal in nature.  Counsel analyzed each of them, often from several different perspectives. (Thompson Decl., ¶¶ 4-5.)  For all of these reasons, the early stage of the litigation did not prevent counsel from adequately assessing the settlement.

### 4. The Reaction of the Class and Lack of Opposition Demonstrates that the Settlement Is Fair.

As in *Lorazepam*, the reaction of class members to the settlement, as evidenced by the number of objections, opt-outs, and claim forms submitted, has been overwhelmingly positive. This response strongly supports approval.  205 F.R.D. at 378.

The Court's Preliminary Approval Order required all opt-outs and objections to be postmarked by May 17, 2002.  As of May 30, 2002, Class Counsel has received *no* objections to the settlement.  (Thompson Decl., ¶ 16; Ness Decl., ¶ 15)  If "[t]he existence of a relatively few objections certainly counsels in favor of approval," *Lorazepam*, 205 F.R.D. at 378, the lack of *any* objections counsels even more strongly in that direction.

As of May 30, 2002, Class Counsel have received 21 timely opt-outs from the settlement.[6] As mentioned in plaintiff's memorandum in support of preliminary approval, Counsel anticipated

---

[6]  As of May 30, 2002, Class Counsel have received one untimely opt-out postmarked May 23, 2002.  (Ness Decl., ¶ 11.)  At this time, Class Counsel takes no position as to whether there is excusable neglect for this class member's failure to meet the May 17, 2002 opt-out postmark deadline.  Class Counsel has notified this class member of her need to present the Court with a

that some class members would opt out because their unique circumstances led them to believe they could do better pursuing individual actions.[7]   In this case, the number of opt-outs is extremely low, constituting about 0.5% of the 4,111 recipients of notice.  *See, e.g., Lorazepam*, 205 F.R.D. at 378 n.15 (2,351 opt outs, representing .2% of the recipients of mailed notice, is "relatively low); *Pigford*, 185 F.R.D. at 102 (finding 5% to be a "low rate of opt-outs").  By comparison, 72 class members opted out of the ERISA case on behalf of AEFA financial advisors that Judge Rosenbaum approved in *Lambert v. American Express Financial Corp.*, Civ. File No. 99-CV-493 (JMR/SRN) (D. Minn.).  (Thompson Decl., ¶ 17)  Absence of objections and a nominal number of opt-outs give rise to a strong inference of satisfaction among class members.  *See In re: Newbridge Networks Securities Litig.*, 1998 U.S. Dist. LEXIS 23238, at *6-7 (D.D.C. October 23, 1998).

The deadline for postmarking claim forms is June 14, 2002.[8]   Although, in Counsel's experience, a large number of claim forms typically are received around the deadline date, Counsel already had received 340 claim forms as of May 30, 2002.  (Thompson Decl., ¶ 19; Ness Decl., ¶ 14.)  Class members are voting overwhelmingly in favor of the settlement.

### 5.    Class Counsel Believe that the Settlement Is Fair, Reasonable and Adequate.

Discretion is left to litigants and their counsel to determine a reasonable compromise, and the Court should give great weight to Class Counsel's view that the settlement meets the substantive and procedural requirements for final approval.  *Lorazepam*, 205 F.R.D. at 380

---

reason for missing the May 17, 2002 opt-out deadline as well as the steps she needs to take to file a Claim Form.  (Thompson Decl., ¶ 16.)

[7]   The desire to pursue individual actions is not the only reason for opt outs.  Only four of the opt-outs have offered explanations for their elections to exclude themselves from the monetary relief.  Two did not believe that they had suffered sex discrimination while employed by or affiliated with AEFA.  The other two, one of whom apparently is represented by counsel, apparently wish to pursue individual actions, in one case for fraudulent misrepresentation rather than discrimination.

[8]   The deadline is later than the deadline for submitting objection and opt-out notices because it takes much longer to fill out the many-page claim form than to prepare a one or two sentence notice of objection or opt out.

(citations omitted); *see also In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 359, 379-80 (N.D. Ohio Aug. 29, 2001) (citing cases); *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561, 580-81 (E.D. Pa. 2001).   Class Counsel are experienced class litigators with substantial experience in employment discrimination class actions.  (Lieder Decl., ¶¶ 2-9.)  Class Counsel and the class representatives believe that the proposed settlement is fair, reasonable and adequate.  (Schaefer Decl., ¶ 12-13.)

Based on all of these considerations – the lengthy arms-length negotiations, the nature of the injunctive and monetary relief obtained, the thorough factual and legal research and analysis performed by Class Counsel before and during the negotiation process, the lack of objections and small number of opt outs, and the opinion of experienced Class Counsel – the Court should conclude that this settlement is fair, reasonable and adequate in the relief obtained for the class from AEFA.

**B.      The Settlement Is Fair in its Allocation of Benefits Between Plaintiffs and Class Members.**

The second criterion for approval of a class action settlement is that it fairly allocate the benefits of the settlement among all class members, including plaintiffs.  The Consent Decree's injunctive and monetary provisions both pass muster.  With one minor exception, plaintiffs are not singled out for any unique benefits.[9]

The injunctive provisions of the Decree are available equally to plaintiffs and members of both settlement classes.  The Decree does not contain any injunctive provisions, such as job relief, specifically benefiting named plaintiffs.

---

[9]   The only benefit that named plaintiffs are receiving that class members are not is that the two plaintiffs who are members of the Injunctive Class but not the Damages Class will receive gross awards of $35,000 and $20,000.   (Consent Decree § V.B.1.(c).)   Class Counsel lacked the information necessary to negotiate monetary relief for the members of the Injunctive Class and therefore members of that class are free under the settlement to pursue individual damage claims. Class Counsel did, however, have information concerning the circumstances of these two representative plaintiffs.  It would have been inefficient and inexpedient not to resolve all of the claims of the two members of the Injunctive Class for which Class Counsel had adequate information on the ground that the monetary claims of other members of the class could not be resolved in this lawsuit.

The Decree provides that the Claims Portion of the Settlement Fund, consisting of $17,550,000 plus an allocable share of interest, will be allocated to members of the Damages Class who timely file claim forms based on a point formula to be developed by Class Counsel and approved by the Court.   The Decree identifies certain factors for which points may be awarded, such as length of service, strength of claims, amount of loss and contributions to the prosecution of the litigation, but those factors are not necessarily comprehensive.   (Consent Decree § V.D.)  The details of the formula, as well as the specific awards, must be submitted to the Court for approval before any disbursements are made.

Similarly, the Decree provides that a Business Development Fund of $2,600,000 plus interest, will be allocated among plaintiffs and other members of the Damages Class who are currently employed as financial advisors by AEFA based on a formula to be developed by Class Counsel and approved by the Court.   Again, the details of the formula must be submitted to the Court for approval before any disbursements are made.

Class Counsel have not attempted to propose formulas for allocating the Claims and Business Development Portions prior to final approval because all claim forms are not yet received and analyzed.  The information contained in the claim forms will help them to devise fair formulas.  Class Counsel probably will not be in a position to propose a formula for several months. (Lieder Decl., ¶ 7.)

Regardless of the formulas eventually proposed, the Court will have the opportunity to insure that they fully protect the interests of class members.  An allocation plan such as the one at issue here that is subject to close court scrutiny at every stage is fair and reasonable even though the precise details of the formula are not spelled out in the decree itself.   *In re Agent Orange Prod. Liability Litigation*, 818 F.2d 1245, 170 (2d Cir. 1987) (where court assessed overall fairness of settlement prior to adoption of distribution scheme, distribution scheme need not be finalized prior to final approval of class settlement); *In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 224 (5th Cir. 1981) (sustaining district court's approval of settlement notice even though amounts each class member could expect to receive are not yet determined);

*In re Drexel Burnham Lambert Group, Inc.*, 130 B.R. 910, 925 (S.D.N.Y. 1991), *aff'd*, 960 F.2d 285 (2d Cir. 1992) (settlement satisfactory even though "amounts to be distributed . . . will be subject to further allocation procedures").  Judge Emmet Sullivan and Judge Royce Lamberth of this District have approved settlements in four different class cases prosecuted by Sprenger & Lang (one of the firms constituting Class Counsel here) providing, as in this case, that the settlement fund would be allocated based on point formulas that were devised after final approval of the settlement and then presented to the Court for approval.  (Lieder Decl., ¶ 7.)

Thus, the Court should conclude that this settlement is fair, reasonable and adequate in its provisions for allocating the relief obtained from AEFA among plaintiffs and class members.

### C.     The Requested Award of Attorneys' Fees and Expenses Is Fair, Reasonable and Adequate.[10]

The final criterion for approval of the settlement is that the proposed allocation of the Settlement Fund between members of the Damages Class and Class Counsel be fair, adequate, and reasonable.  The settlement satisfies this requirement as well.

Class Counsel requests three allocations totaling 35% of the Settlement Fund, or $10,850,000 plus interest, to cover fees and expenses.  The first, equal to 30% of the Settlement Fund, will cover past fees and expenses and part of the fees and expenses associated with the claims administration and monitoring duties of Class Counsel.  The latter two, totaling 5% of the Settlement Fund, will cover the remaining fees and expenses associated with Class Counsel's claims administration and monitoring duties.[11]

For purposes of evaluating the fee and expense provisions, this is a "common fund" case, that is, Class Counsel's efforts produced a common fund of money for the benefit of not only the plaintiffs with whom they had retainer agreements, but also potentially thousands of class members with whom they did not have contractual arrangements.  In the D.C. Circuit, proposed fee awards in common fund cases should be evaluated based on the "percentage-of-the-fund

---

[10]   As stated in the Consent Decree, defendants take no position as to the proposed fees or award allocation, and therefore, on that basis, do not oppose those aspects of this submission.

method." *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993); *Lorazepam*, 205 F.R.D. at 383. "[T]he percentage of recovery method is meant to simulate awards that would otherwise prevail in the market." *In re Vitamins Antitrust Litig.,* MDL No. 1285, at 29 (D.D.C. July 16, 2001) ("*Vitamins*") (Hogan, C.J.).

### 1.   Class Counsel Seeks Under 28% of the Settlement Fund Allocable to Fees for Work Already Performed in the Case.

The $10,850,000 to be paid to Class Counsel does not represent compensation just for work done until the date of settlement.  It includes compensation for work to be performed in claims administration and monitoring, and reimbursement for expenses already incurred in the matter and to be incurred in the administration and monitoring process.

Class Counsel estimates, based on experience in other cases, that the fees at lodestar rates and expenses involved with claims administration and monitoring over the next four years will be about $2 million.  In *McLaurin v. National Railroad Passenger Corp.* and *Thornton v. National Railroad Passenger Corp.*, race discrimination class action cases before Judge Sullivan settled in 1999 and 2000, Sprenger & Lang (co-lead counsel in this case and lead counsel in both of those cases) has claims administration and monitoring responsibilities during the four year periods of each decree.  In *McLaurin*, Sprenger & Lang has to date incurred fees at current lodestar rates of about $457,104 and expenses of about $262,691 over the approximately two and a half years that have already elapsed.  In *Thornton*, it has to date incurred fees at current lodestar rates of about $510,837 and expenses of about $360,693 over the approximately two years that have already elapsed.  The class size, not including rejected applicants, was about 700 in *McLaurin* and about 1,000 in *Thornton*, or about 1/6 and 1/4 of the class size in this case. Projecting fees and expenses until the end of the *McLaurin* and *Thornton* decree periods and adjusting to take into account the much larger size of the class in this case, Class Counsel projects that fees at lodestar rates and expenses in administering and monitoring the settlement

---

[11]   Three percent, or $930,000, plus interest, will be payable on December 15, 2002, and two percent, or $620,000, plus interest, will be payable on December 15, 2003.

will be between $1.75 million and $2.5 million, or an average estimate of $2 million, of which $750,000 will be expenses and the balance fees.  (Lieder Decl., ¶ 8.)

Lawyers who represent plaintiffs in class cases not brought under the civil rights laws, such as securities fraud and antitrust cases, generally do not incur any or incur only minimal attorneys' fees and costs post-settlement.  Generally there is either no injunctive relief or relief that requires only minimal monitoring.  *Compare Amchem*, 521 U.S. at 614 ("Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of cases certifiable under Fed. R. Civ. P. 23(b)(2) as primarily seeking injunctive relief) *with Vitamins*, at 3 n.8 (noting that injunctive relief consisted of a prohibition against the defendants engaging in horizontal conduct constituting a per se violation of the law).  In class cases not brought under the civil rights laws, claims frequently are paid pursuant to a very simple formula that is inexpensive to administer,[12] and/or are not administered by class counsel and hence represent a separate charge against the settlement fund.  *See, e.g., Lorazepam*, 205 F.R.D. at 382 (awarding $8,250,000 for claims administration apart from award of attorneys' fees and costs).

Class Counsel's requested award also includes reimbursement for expenses already incurred, of $290,000.  Typically, expenses are requested separately from fees.  *See, e.g. Vitamins*, at 29 (awarding about $123 million in fees, representing about 34% of the settlement fund, and order Class Counsel to submit additional documentation to justify their separate expense reimbursement request of about $3,260,000); *In re Newbridge Networks Sec. Litig.*, 1998 WL 765724, at *10-12 (reimbursing attorneys for their expenses in addition to awarding them 30% of settlement fund for fees, bringing their total award to about 33.5% of the settlement fund).

---

[12]  For example, Sprenger & Lang represented plaintiffs and the classes in two cases against First Union Corporation alleging violations of the Employee Retirement Income Security Act ("ERISA") in connection with the administration of that company's 401(k) plan for its employees.  There were minimal monitoring duties, and the settlement fund was distributed pursuant to a very simple formula.  The firm has incurred only about $473,666 in fees post-settlement to administer a settlement for the benefit of about 145,000 class members, of who nearly 46,000 filed claim forms.  (Lieder Decl., ¶ 9.)  That settlement had a class about 200 times larger than in *McLaurin*.

To properly compare Class Counsel's fee request to those awarded in antitrust, securities fraud, or most non-civil rights cases, therefore, it is necessary to subtract the projected fees and expenses for administration and monitoring and the actual expenses already incurred of $290,000 from the $10,850,000 request.  Using the midpoint of estimated future fees and expenses for administration and monitoring work over the four-year term of the Decree ($2 Million), this brings the request for fees for work already performed down to between $8,560,000 , or to 27.6% of the settlement fund.

### 2.     A Fee Award of 27.6% for Work Already Performed Is Fair and Reasonable.

Fee awards in this District have ranged from 20% to 45% of the fund, while tending to center around 30%.[13]  *See Swedish Hospital*, 1 F.3d at 1272 (20%); *Vitamins* at 23 (about 34% plus expenses); *Thornton* (Schaefer Decl., ¶¶ 21-23) (37.5% for past and future fees and expenses); *McLaurin* (Schaefer Decl., ¶¶ 21-23) (37.5% for past and future fees and expenses); *In re Newbridge Networks Sec. Litig.*, 1998 U.S. Dist. LEXIS 23238, at *10-12 (30% plus expenses); *In re Ampicillin Antitrust Litig.*, 526 F. Supp. 494 (D.D.C. 1981) (45%, including expenses).[14]  Awards around 30% are consistent with the trend in numerous other jurisdictions, s*ee, e.g., Elliott v. Sperry Rand Corp.*, 680 F. 2d 1225 (8th Cir. 1982) (36%); *In re Aetna Inc. Sec. Litig.*, 2001 U.S. Dist. LEXIS 68 (E.D. Pa. Jan. 4, 2001) (30% in fees and $1,500,000 in expenses); *In re Combustion, Inc.*, 968 F. Supp. 1116 (W.D. La. 1997) (36%); *In re Airline Ticket Comm'n Antitrust Litig.*, 953 F. Supp. 280 (D. Minn. 1997) (Rosenbaum, J.) (33⅓%), except in megafund cases of over $100,000,000 in which some courts award smaller percentages. *But see Vitamins* at 27-29 (refusing to reduce percentage based on large size of settlement).

---

[13]   About a decade ago, the D.C. Circuit in *Swedish Hospital Corp.  v. Shalala*, 1 F.3d at 1265, said that awards in percentage of the fund cases range from 15% to 45%, with the norm between 20% and 30%.  Recent awards move those average figures upward.

[14]   *Lorazepam* is an exception.  In that case, the attorneys requested, and the Court awarded, fees equal to only 13.5% of the settlement fund.  205 F.R.D. at 385.  Presumably, the request was so modest in that case because the primary plaintiffs were the Federal Trade Commission and 33 states, and their lawyers were employees of the FTC and the offices of the attorneys general for the various states.

The D.C. Circuit has not developed a list of factors to be considered in evaluating fee requests in common fund cases. *Lorazepam*, 205 F.R.D. at 383. In two recent decisions, Judge Hogan has cited with approval the lists of factors considered by the Third Circuit and a second set used by the Tenth and Fifth Circuits, while, in his analyses, he has apparently relied primarily on the factors in the Third Circuit list. *See id.*; *Vitamins* at 25. Class Counsel shows that, based on the Third Circuit list of factors, a fee award in the range of 27.6% for pre-settlement work, plus fees and expenses sufficient to cover projected post-settlement work, is fair and reasonable.[15]

### a. The size of the fund created and the number of persons benefited.

Courts tend to reward settlements that produce "exceptional benefits" with higher percentages of recoveries, except possibly if a settlement is so large that a strictly percentage reward would be completely disproportionate to the amount of time invested. *See Vitamins* at 25-26. As mentioned above, Class Counsel believes that this is one of the ten largest settlements ever of a gender discrimination class action lawsuit. (Thompson Decl., ¶ 15.)

Moreover, the benefits to the thousands of class members are not limited to money; the Consent Decree also provides comprehensive injunctive relief. This type of relief was not involved in *Swedish Hospital*, *Vitamins*, or *Newbridge Networks*. Negotiating and drafting the provisions concerning injunctive relief consumed more hours and energy than did the provisions concerning monetary relief. If the value of injunctive relief is not factored into attorneys' fee awards, attorneys will have little incentive to negotiate such provisions in employment discrimination class actions, even though they are at least equally important in creating a work environment with equal opportunity to all than are monetary awards. (*See* Declaration of David Borgen, ¶ 13; Declaration of Jeffrey R. Anderson, ¶ 8.) The legal system should not create a

---

[15] The result would be no different using the Tenth Circuit factors, which are similar to the Third Circuit's except that the Tenth Circuit subdivides some of the factors, making for a more repetitious presentation.

disincentive to negotiation of injunctive provisions in settlements, and the significant value of this relief should be considered in approving the percentage of the fund requested as a fee award.

>    **b.**    **The presence or absence of substantial objections by members of the class to the settlement and/or the requested fees.**

As discussed above, no class members have objected to the settlement, including to the requested fees and costs, which were specified in the detailed mailed notice. This should carry substantial weight; frequently class members do object to attorney fee awards. *See, e.g., Vizcaino v. Microsoft Corp.*, 2002 U.S. App. LEXIS 9188, at *4 (May 15, 2002) (approving fees of about $27 million despite objections from two class members to the amount); *Weil v. Long Island Savings Bank*, 188 F. Supp. 2d 258; 2002 U.S. Dist. LEXIS 8429, at *5 n.3 (E.D.N.Y. Jan. 16, 2002) (approving settlement but reserving ruling on attorneys' fees, the primary focus of class members' objections); *Mangone v. First USA Bank*, 206 F.R.D. 222, 236 n.3 (S.D. Ill. 2001) (approving settlement but addressing objections to attorneys' fees in a separate opinion). The absence of objections indicates that class members accept the proposed fee and cost allocation.

>    **c.**    **The skill and efficiency of the attorneys involved.**

Class Counsel are highly skilled and experienced attorneys. Sprenger & Lang specializes in class action litigation on behalf of plaintiffs, generally employees, and has achieved numerous landmark results in this District and elsewhere. Among the highlights are settlement of age discrimination collective action lawsuits against First Union Corporation and Ceridian Corporation for $58.5 million and $28.5 million respectively, settlement of race discrimination lawsuits against PEPCO and Amtrak in this District for total amounts of over $62 million in cash plus sweeping injunctive relief, certification of the first hostile environment class against women and then achievement of the first liability finding to the class in a hostile environment case, earning what Class Counsel believes is the largest settlement ever in a plant closing case, and settlement of a landmark ERISA case for $26 million. (Lieder Decl., ¶ 3.) Miller-O'Brien is one of the most respected plaintiffs' labor and employment firms in the State of Minnesota (O'Brien Decl., ¶¶ 3-4.) The attorneys of the two firms who primarily worked on this case have played leading roles in their firms' employment cases, giving them a wealth of experience in similar

class action litigation.   (Lieder Decl., ¶¶ 3-4; O'Brien Decl., ¶¶ 4-7.)   Opposing counsel from Dorsey & Whitney is of equivalent skill and experience.

Thus, the skill and experience of Class Counsel and opposing counsel all support award of a fee in the range requested by Class Counsel.  *See Vitamins* at 26 (approving 34% fee award based in part on "[t]he experience, skill and professionalism of counsel and the performance and quality of opposing counsel").

### d.      The complexity and duration of the litigation.

Employment discrimination class actions challenging a company's discriminatory application of policies and procedures that give substantial discretion to a large number of managers are both factually and legally complex, and this case was no exception.   Factually, Class Counsel had to identify the policies and procedures that contributed to the alleged discrimination and develop evidence that those policies and practices were administered centrally in a discriminatory manner and that AEFA had a pattern or practice across offices scattered across the country of administering the policies and procedures in a discriminatory manner.   This, as discussed in subsection "f" below, necessitated contacts with numerous class members and other witnesses.

Some of the legal complexities are evidenced in the division between the circuits concerning whether employment discrimination class actions in which the plaintiffs seek compensatory and punitive damages and/or a jury trial may even be maintained.   *Compare Robinson v. Metro-North Commuter Railroad Co.*, 267 F.3d 147 (2d Cir. 2001) (reversing denial of class certification because it was improper of district court to adopt per se rule that case seeking compensatory and punitive damages may not be certified under Rule 23(b)(2), and holding that district court abused its discretion in not certifying at least the liability issues pursuant to Rule 23(b)(2)), *cert. denied* 2002 U.S. LEXIS 1894 (Mar. 18, 2002) *with Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998) (affirming denial of class certification under both Rule 23(b)(2) and (3) using reasoning that would make it absolutely or virtually impossible to ever certify an employment discrimination class action in which the plaintiffs seek

compensatory and/or punitive damages and request a trial by jury).[16]  This case presented the additional legal complexity that AEFA classified many of the prospective class members as independent contractors, and federal law bars discrimination against employees but not independent contractors.  (Schaefer Decl., ¶ 9; Thompson Decl., ¶ 4.)  Again, as discussed in subsection "f" below, Class Counsel performed a large amount of research in an attempt to deal with these and other issues.

The litigation lasted about three years from the commencement of investigation by Class Counsel, and about two years from the filing of the initial class charges of discrimination with the Equal Employment Opportunity Commission, until the parties agreed to a settlement.  By litigation standards in the employment discrimination class action arena, the parties were remarkably efficient in reaching resolution so quickly.  The pre-suit nature of this settlement was only made possible, however, by the parties' agreement, as a condition of conducting meaningful settlement negotiations, to the voluntary exchange of voluminous discovery, the sort of exchange that only occurs in cases that are hotly and comprehensively litigated.  In the words of Judge Hogan as he awarded about $123 million in attorneys' fees, about 34% of the settlement fund, "counsel should not be penalized for achieving an effective and efficient settlement."  *Vitamins* at 27; *see Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 198 (3rd Cir. 2000) (recognizing purpose of percentage of recovery method is to encourage early settlement); *Maley v. Del Global Technologies Corp.*, 186 F. Supp. 2d 358, 368 (S.D.N.Y. 2002) (awarding 33% in common fund securities case settled early in litigation); *In re APAC Teleservices, Inc. Sec. Litig.*, 1999 U.S. Dist. LEXIS 17908, at *2 (S.D.N.Y. Dec. 10, 2001) (awarding 33% of a $21,000,000 settlement prior to start of depositions); *In re Safety Components Int'l Inc. Sec. Litig.*, 166 F. Supp. 2d 72 (D.N.J. Sept. 27, 2001) (awarding 33% of settlement fund when case settled early in litigation).  This is especially true when an effective and early resolution was achieved only because Class

---

[16]   This Court, as discussed above, has rejected *Allison*'s *per se* rule that employment discrimination class actions may not be certified under Rule 23(b), *Taylor v. D.C. Water & Sewer Authority*, 205 F.R.D. 43 (D.D.C. 2002).  Class Counsel nonetheless had to analyze how to structure the class so as to maximize the likelihood of certification.

Counsel expended tremendous resources in time and money in assembling and assimilating information and negotiating the terms of the settlement.

**e.      The risk of nonpayment.**

Courts recognize that the riskier the case, the greater the justification for a substantial fee award.  The riskiness of a case must be assessed as of the commencement of representation, not sometime later when developments in the litigation made nonpayment more or less risky.  *See, e.g., Shelton v. General Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988); *Emery v. Hunt*, 132 F. Supp. 2d 803, 811 (D.S.D. 2001); *Cook v. McCarron*, 1997 U.S. Dist. LEXIS 1090, at *58 (N.D. Ill. Jan. 30, 1997).

Employment discrimination class actions are very risky.  The difference in risk between them and many other types of class actions, including antitrust, securities fraud, and consumer product class actions, is highlighted by the lack of competition among plaintiffs' lawyers to prosecute them.  In *Vitamins*, for example, 57 law firms represented the plaintiffs.  *Vitamins* at 2 n.3.  During the 13 years in which Sprenger & Lang has been in existence, on only one occasion did another firm file a class action that overlapped with one filed by Sprenger & Lang, and in no case has the firm been "beaten" to the courthouse by another firm.  (Lieder Decl., ¶ 5.)  Many lawyers are afraid of experiences like Sprenger & Lang's, which last year had to write off on a single case over $300,000 in out of pocket expenses and over $5,000,000 in fees – every hour that the firm had worked on the case –when a class was not certified and the amounts for which the firm was able to settle the claims of its 24 individual clients were not close to sufficient to cover the firm's investment in the case.  (*Id.*, ¶ 6.)  In short, "[u]nlike in cases where lawyers compete for lead counsel status and may even bid in a court-supervised auction, in employment class actions like this one, no ascertainable 'market' exists." *Vizcaino v. Microsoft Corp.*, ___ F.3d ____, 2002 U.S. App. LEXIS 9188, at *13 (9th Cir. May 15, 2002).

Employment discrimination class action cases are risky for many reasons.   There generally is no government investigation to draw upon, as there frequently is in other types of class action cases.  *See Vitamins* at 26 (holding that one factor justifying large award was that at

28

commencement of representation the government had not commenced any investigation into alleged price-fixing conspiracy).  Companies are able to keep figures concerning the impact of their employment practices private, forcing plaintiffs' firms to perform expensive investigations prior to filing suit, unlike, for example, in securities class actions.  Many courts give great credence to employers' business rationales for their policies and practices.

Among employment discrimination class actions, this case was especially risky at the time that Class Counsel agreed to represent the plaintiffs for two reasons, as described above: the employee-independent contractor issue; and the attempt to certify a nationwide class of women affected by decisions by hundreds of managers in scores of facilities.  (Schaefer Decl., ¶ 9.)  Substantial likelihoods existed that the Court would not certify a class, that if a class were certified it would be substantially more circumscribed than plaintiffs proposed, and that if a class were certified, the damages would be far less than plaintiffs sought.  (*Id.*, ¶ 9.)  These risks of nonpayment are more than sufficient to justify the requested award.  *See Newbridge Network Sec. Litig.*, 1998 U.S. Dist. LEXIS 23238, at *11 ("[U]nlike in *Swedish Hospital Corp.*, where an award of twenty percent was made because prior resolution of the underlying legal issue eliminated the risk of zero recovery, . . . here counsel did not 'piggyback' on the success of other plaintiffs and clearly faced the prospect of zero recovery.")

> **f.**      **The amount of time devoted to the case by plaintiffs' counsel.**

Although this case was settled early, Class Counsel has invested a tremendous amount of work into the matter over the past three years – over 10,243 hours of attorney and legal assistant time – along with over $225,000 in expenses.  (Lieder Decl. at ¶ 12, Exs. A & C.)  They gathered tremendous quantities of information outside the discovery process, through contacts with over 560 class members and other witnesses, extensive interviews with about 90 persons, preparation of 45 declarations, and regular conferences with the named plaintiffs.  (Thompson Decl., ¶ 3.)  Prior to and during the negotiation process, they obtained information about AEFA's policies and AEFA's computerized personnel information from the defendant.  (Schaefer Decl., ¶ 4.)  They worked with a statistical expert to analyze AEFA's data.  (*Id.*)  They prepared a database

summarizing the documents and information they were obtaining.  (Thompson Dec., ¶ 3.)  They performed the legal research for and prepared numerous memoranda analyzing the many legal issues in the case.  (*Id.*, ¶ 4.)  They engaged in ten face-to-face negotiating sessions and spent a large amount of additional time on the phone with the mediator and opposing counsel.  (Schaefer Decl., ¶ 5.)  They worked with tax lawyers in addressing the issues raised by the fact that AEFA has treated many of the class members as independent contractors.  (Thompson Decl., ¶ 5.)  Finally, they have been working with a consultant in connection with the issuance of notice to class members and the beginning of the claims administration process.  (*Id.*, ¶ 6-9.)

*Vitamins*, like this case, settled quickly.  Indeed, settlement occurred about two years after Class Counsel commenced their investigations (investigation began in 1997, *Vitamins* at 26 n.34, and the Court preliminarily approved the settlement on November 23, 1999, *id.* at 2), less than the three years it took for settlement to be achieved in this case.  Judge Hogan nonetheless decided that sufficient work had been done by counsel in that case to justify an award of 34% of the settlement fund, about $123,000,000, without receiving any information at all concerning the dollar value of the work performed at lodestar rates.  (Lieder Decl., ¶ 32, Ex. D.)

In not considering lodestar rates, Judge Hogan was following the implied teaching of the D.C. Circuit in *Swedish Hospital*.  In that case, the majority never mentioned class counsel's fees based on their lodestar rates, let alone considered whether the award based on the percentage of recovery methodology should be adjusted based on the lodestar fees.  It was only the dissenter, Judge Douglas Ginsberg, who mentioned the amount of the lodestar fees and wished to check the award against those fees.  1 F.3d at 1273 (Ginsberg, J., dissenting).

Thus, information concerning Class Counsel's lodestar is irrelevant to the decision whether to approve the requested fee and cost allocation.  However, in case the Court wishes to check Class Counsel's lodestar investment in the case against the requested fees, the Court should know that, through April 30, 2002, Class Counsel had devoted $2,873,806.63 in fees and over $290,000 in expenses to prosecuting this action.  (Lieder Decl., ¶ 12, Exs. A & C --

explaining basis for determining billing rates[17] and methodology for calculating Sprenger & Lang's hours and expenses); O'Brien Decl., ¶¶ 8-10 (explaining methodology for calculating Miller-O'Brien's hours and expenses).)

Exclusive of past and projected future expenses of $940,000, Class Counsel's requested fee award is $9,910,000.  Using Class Counsel's already incurred lodestar of about $2,870,000 plus projected fees for settlement administration and monitoring of $1.25 Million, the requested fee award amounts to an award of 2.27 times the lodestar of about $4,370,000.  This is far less than the 3.3 multiplier the D.C. Circuit approved in *Swedish Hospital*, 1 F.3d at 1273 (Ginsberg, J., dissenting), and a smaller enhancement than has been approved in scores of other common fund cases.  *See, e.g., In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (Bankr D. Md. 2000) (awarding fees of 40% of $185,000,000 common fund for a multiplier of 19.6 times the lodestar); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706 (E.D. Pa. 2001) (awarding fees of 25% of $193,000,000 common fund for a multiplier of between 4.5 and 8.5); *In re Aetna Inc. Sec. Litig.*, 2001 WL 20928 (E.D. Pa. Jan. 4, 2001) (awarding fees of 29.5% of $83,000,000 common fund for multiplier of 3.6).

### g.        The awards in similar cases.

Class Counsel has cited above to numerous decisions concerning awards in other cases, but the most similar are the two race discrimination class action cases against Amtrak before Judge Sullivan, *McLaurin* and *Thornton*.  Each case entered settlement discussions early, after the filing of the complaint in *McLaurin* and after a motion to dismiss and two depositions in *Thornton*.  In those cases, like this one, the negotiations proceeded for many months.  In those cases, like this one, the settlement provided for comprehensive injunctive relief in addition to damages.  In those cases, like this one, the award to Class Counsel encompassed both past and

---

[17] Billing rates are determined primarily through a published survey of rates of other law firms in the District of Columbia prepared by a recognized authority on firm economics (Lieder Decl., ¶ 14), a methodology for determining rates approved by courts of this district.  *See Salazar v. District of Columbia*, 123 F. Supp. 8, 14 (D.D.C. 2000).  Class Counsel also have presented declarations from other knowledgeable practitioners concerning the reasonableness of the billing rates. (Borgen, Anderson, Heins Declarations.)

future work and past and future expenses.  The period of the Decree in those cases, like this one, was four years.  In light of all of these circumstances, Judge Sullivan awarded class counsel in each case fees and expenses in the amount of 37.5% of the settlements, 2.5% more than requested in this case.  (Lieder Decl., ¶¶ 3, 8.)

For all these reasons, the proposed fee and expense award here is fair and reasonable, is consistent with all applicable precedent, and should be approved.

## IV.     THE COURT SHOULD ENTER THE STIPULATION AND ORDER OF SPECIAL REFERENCE.

As part of the settlement, the parties agreed to the appointment of a Special Master to handle any disputes that might arise during the monitoring process, which agreement was reflected in a proposed order.  (Consent Decree, §VII.B.6 and Exhibit F thereto.)  This provision has at least three advantages over the more-normal process of taking all monitoring disputes to a judge.  First, any dispute probably will be heard and resolved more expeditiously than before this Court.  Next, the special master will become familiar with the Decree, which should be important in rendering fair and consistent decisions.  Finally, AEFA's headquarters and hence the location of likely witnesses are in Minneapolis, as are the offices of the special master and alternative special master designated in the proposed order.  Thus, the special master process probably will result in a less expensive adjudicatory process than would proceedings before this Court.  Perhaps more important than the rationales for the proposed order, the agreement was an essential part of the total settlement, and the Court should adopt the entire agreement.  *See Columbus-America Discovery Group v. Atlantic Mutual Insurance Co.*, 203 F.3d 291, 299 (4th Cir. 2000) (reversing district court's vacation of part of settlement agreement because court either must enforce settlement in its entirety or reject the whole; it may not pick the parts it likes).

The order contains all of the provisions necessary under Fed. R. Civ. P. 53 for a reference of a dispute to a special master.  Among other things, it provides for the appointment of a primary and secondary Special Master pursuant to Fed. R. Civ. P. 53(a), specifies the powers of the Special Master and the procedures to follow in these proceedings, the effect of the Special

Master's rulings, and the compensation to be provided.  The Court therefore should enter the proposed Order and Stipulation of Reference.

## CONCLUSION

For all the foregoing reasons, the plaintiffs request the Court to approve the proposed classes, find that Class Counsel complied with the notice provisions of the Preliminary Approval Order, issue the proposed Order granting final approval of the proposed Consent Decree, and enter the Stipulation and Order of Reference.

DATED:  May 31, 2002

_____
Paul C. Sprenger (DC No. 412029)
Michael D. Lieder (DC No. 444273)
Steven M. Sprenger (DC No. 418736)
SPRENGER & LANG, PLLC
1614 Twentieth Street, N.W.
Washington, DC 20009
(202) 265-8010
(202) 332-6652 (facsimile)

_____
Maurice W. O'Brien (MN No. 130229)
Nancy J. Miller (MN No. 203518)
MILLER-O'BRIEN, PLLP
One Financial Plaza, Suite 2400
120 South Sixth Street
Minneapolis, MN 55402
(612) 333-5831
(612) 342-2613 (facsimile)

_____
Lawrence P. Schaefer (MN No. 195583)
Mara R. Thompson (MN No. 196125)
SPRENGER & LANG, PLLC
325 Ridgewood Avenue
Minneapolis, MN 55403
(612) 871-8910
(612) 871-9270 (facsimile)

ATTORNEYS FOR PLAINTIFFS
AND THE CLASSES